# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **IN RE APPLICATION OF PENNLIVE, YORK DAILY RECORD, AND YORK DISPATCH TO UNSEAL COURT RECORDS** | Misc. Action No. 1:22-mc-00756 <br> Hon. Susan E. Schwab |

### AMENDED NOTICE OF SUPPLEMENTAL AUTHORITY

Applicants PennLive, York Daily Record, and York Dispatch ("Applicants") respectfully withdraw their prior notice of supplemental authority, *see* ECF No. 31, and submit this amended notice in compliance with Local Rule 7.36.

The recent decision of the U.S. District Court for the District of Columbia unsealing certain judicial records related to the seizure of Congressman Scott Perry's cellphone is relevant to the disposition of the Application.  *See* Memorandum Opinion & Order, *In re the Search of the Forensic Copy of the Cell Phone of Representative Scott Perry*, No. 1:22-sc-2144 (D.D.C. Feb. 24, 2023), https://perma.cc/4AY7-F6SH.  Chief Judge Howell's decision and the judicial records unsealed as a result are attached hereto for the convenience of the Court.

Dated: March 1, 2023                    Respectfully submitted,

*s/ Katie Townsend*

1

Katie Townsend*
[CA 254321]
ktownsend@rcfp.org
Paula Knudsen Burke
pknudsen@rcfp.org
Grayson Clary*
gclary@rcfp.org
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, DC 20005
Phone: 202.795.9300
Facsimile: 202.795.9310

* Admitted pro hac vice

Counsel for Applicants PennLive, York
Daily Record, and York Dispatch

## CERTIFICATE OF SERVICE

I, Katie Townsend, hereby certify that on the 1st day of March, 2023, a copy

of the foregoing was filed electronically using this Court's CM/ECF system.

Dated: March 1, 2023                    Respectfully submitted,

                                        *s/ Katie Townsend*
                                        Katie Townsend
                                        REPORTERS COMMITTEE FOR
                                          FREEDOM OF THE PRESS

                                        *Counsel for Applicants PennLive, York
                                        Daily Record, and York Dispatch*

# ATTACHMENT

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF THE FORENSIC COPY OF THE CELL PHONE OF REPRESENTATIVE SCOTT PERRY

Case No. 22-sc-2144

Chief Judge Beryl A. Howell

## <u>MEMORANDUM AND ORDER</u>

In two Minute Orders issued in this sealed docket on February 23, 2023, and February 24, 2023, the Court directed the parties in this matter—the government and Congressman Scott Perry ("Rep. Perry")—to explain why redacted versions of the judicial records should not be unsealed, in light of the facts that the D.C. Circuit held oral argument open to public, in part, on February 23, 2023 regarding Rep. Perry's appeal of the Court's Order Granting in Part and Denying in Part Rep. Perry's Motion for Nondisclosure, ECF No. 24 (SEALED), and that redacted versions of opinions and orders have been released to certain members of the House of Representatives and the General Counsel and associated staff in the House of Representatives, pursuant to an order permitting such limited disclosure, Amended Order at 2-3, ECF No. 38 (SEALED). *See* Minute Order (Feb. 23, 2023) (SEALED); Minute Order (Feb. 24, 2023) (SEALED) (requesting the parties to address specifically why the judicial records should not be unsealed pursuant to "the common law right of public access to judicial records under the factors set out in *United States v. Hubbard*, 650 F.2d 293, 317-22 (D.C. Cir. 1980)").

The parties responded to the Minute Orders in a joint status report, *see* Parties' Joint Status Report, ECF No. 40 (SEALED), but took different positions. The government agrees that the redacted versions of certain judicial records already released to members of the House of Representatives and the General Counsel and associated staff in the House of Representatives

1

"may now be made public," given public disclosure of facts regarding this matter to the public. *Id*. at 1. At the same time, the government emphasizes "that fully unredacted copies of the documents should not be made publicly available" because "[p]ublic dissemination of completely unredacted documents could impair the Government's investigation by revealing aspects of the investigation that have not been made public." *Id*. Meanwhile, Rep. Perry opposes release of even the redacted versions of the judicial records due to concern such release "would severely prejudice him." *Id.* at 3.

The redacted judicial records already disclosed to certain members of the House of Representatives and the General Counsel and associated staff in the House of Representatives are: (1) Redacted November 4, 2022, Memorandum Opinion and Order, ECF No. 41; (2) Redacted November 28, 2022, Order, ECF No. 42; (3) Redacted December 28, 2022, Memorandum Opinion, ECF No. 43; and (4) Redacted January 4, 2023, Memorandum Opinion.

The Court is persuaded that unsealing of these judicial records in redacted form is justified under the common-law right of public access to judicial records, pursuant to the factors set out in *Hubbard v. United States*. *See also Metlife, Inc. v. Fin. Stability Oversight Council*, 865 F.3d 661, 665 (D.C. Cir. 2017) (listing *Hubbard* factors as follows: (1) the need for public access to the documents at issue; (2) the extent of previous public access to the documents; (3) the fact that someone has objected to disclosure, and the identity of that person; (4) the strength of any property and privacy interests asserted; (5) the possibility of prejudice to those opposing disclosure; and (6) the purposes for which the documents were introduced during the judicial proceedings.). As the Supreme Court has instructed, "the decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the

particular case," *Nixon v. Warner Commc'ns*, Inc., 435 U.S. 589, 599 (1978), and those relevant facts and circumstances here militate in favor of releasing these redacted judicial records.

The first *Hubbard* factor—the need for public access to the materials at issue—weighs heavily in favor of releasing the judicial records in this matter. The powerful public interest in accessing these judicial records cannot be understated. They concern the scope and applicability of the Speech or Debate Clause of the U.S. Constitution to records seized on the cell phone of Rep. Perry, in connection with an ongoing investigation of potential federal criminal law violations stemming from efforts to overturn the 2020 presidential election. *See In re Los Angeles Times Commc'ns LLC*, 28 F.4th 292, 298 (D.C. Cir. 2022) (noting, in applying *Hubbard* factors, the "powerful public interest in learning of a sitting Senator's potential violation of insider-trading laws based on information acquired in his official capacity").

The second *Hubbard* factor—the extent of previous public access to the judicial records— also weighs in favor of disclosure. The D.C. Circuit just yesterday held oral argument open to the public, in part, on Rep. Perry's appeal of this Court's Order, and, further, redacted versions of the opinions and orders in question have already been released to certain members of the House of Representatives and the General Counsel and associated staff in the House of Representatives to facilitate the participation of the House in Rep. Perry's pending appeal to the D.C. Circuit. *See* Amended Order at 2-3. The significant disclosure to multiple people of these redacted judicial records thus weighs in favor of disclosure.

The third, fourth, and fifth *Hubbard* factors—which essentially "ask variations of the same question: to what extent harm to legitimate interests, including privacy or law enforcement interests, would result from unsealing," *In re Los Angeles Times Commc'ns LLC*, No. MC 21-16 (BAH), 2022 WL 3714289, at *7 (D.D.C. Aug. 29, 2022) (cleaned up)—do not weigh against

3

disclosure.  To be sure, the judicial records at issue do provide some information about the contents of Rep. Perry's communications, but the specifics of those responsive records are redacted. Similarly, any specific details concerning the government's investigation, such as discussions of the D.D.C. Warrant, have been redacted, *see, e.g.*, Mem. Op. at 2. n.2, mitigating concerns that disclosure of these judicial records in redacted form would pose harm to the government's ongoing investigation, beyond what has already been the focus of intense media attention. *Cf. In re Los Angeles Times*, 2022 WL 3714289, at *7 (adopting certain "proposed redactions" by the government "because they detail identifying information about third parties and their contributions to the investigation and related law enforcement techniques and processes, the release of which poses significant risk of triggering the harms highlighted by [the Department of Justice]"). Moreover, while the Court is mindful of Rep. Perry's concern that release of the judicial records, even in redacted form, may result in prejudice to him, *see* Joint Status Report at 3–4, the problem with Rep. Perry's argument is that the facts surrounding these judicial records have already been disclosed to the public in the D.C. Circuit's partially open argument yesterday.  Moreover, at Rep. Perry's request, the House's intervention into Rep. Perry's appeal of the Order resulted in the release of the redacted judicial records to several other Members of Congress and the House General Counsel's Office.  Public release of these redacted judicial records would result in no additional prejudice to Rep. Perry and, if at all, provide greater context to the public.

For the foregoing reasons, it is hereby:

**ORDERED** that the Clerk of the Court promptly make publicly available by posting on the Court's website the following: (1) the Redacted November 4, 2022, Memorandum Opinion and Order, ECF No. 41; (2) the Redacted November 28, 2022, Order, ECF No. 42; (3) the Redacted December 28, 2022, Memorandum Opinion, ECF No. 43; and (4) the Redacted January 4, 2023,

Memorandum Opinion and Order, ECF No. 44 (collectively, the "Redacted Records"); and this Memorandum and Order; it is further

      **ORDERED** that the parties, **by April 25, 2023**, submit a joint status report to the Chief Judge of this Court, advising the Court whether the Redacted Records be further unsealed, in whole or in part.

      **SO ORDERED**.

Date: February 24, 2022

_____
BERYL A. HOWELL
Chief Judge

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE FORENSIC COPY OF THE CELL PHONE OF REPRESENTATIVE SCOTT PERRY | Case No. 22-sc-2144 |
|  | Chief Judge Beryl A. Howell |
|  | **UNDER SEAL** |

### MEMORANDUM OPINION AND ORDER

Congressman Scott Perry ("Rep. Perry") has represented the Commonwealth of Pennsylvania's Tenth Congressional District since January 2013. *See* Rep. Perry's Resp. to the Gov't's Brief Regarding the Applicability of the Speech or Debate Clause ("Perry Resp.") at 4, ECF No. 15



Now, the parties dispute whether the Speech or Debate Clause of the U.S. Constitution ("Clause"), U.S. Const. Art. I, § 6, Cl. 1., protects against the disclosure of potentially privileged records and communications on Rep. Perry's cell phone to the government, and if it does, which party bears the burden of proving the Clause's applicability. For the reasons set out below, under binding precedent in this Circuit, the Clause's protections require judicial review of Rep. Perry's claims of privilege prior to the disclosure of those records and communications to the government, and Rep. Perry bears the burden of proving the Clause applies.

1

## I.    BACKGROUND

A search and seizure warrant to seize Rep. Perry's personal cell phone was issued by a magistrate judge in the Middle District of Pennsylvania and executed on August 9, 2022, when the Federal Bureau of Investigation ("FBI") forensically extracted an image of the phone's contents. *See* Aff. of FBI Special Agent In Support of Appl. For Search Warrant (dated Aug. 18, 2022) ("D.D.C. Warrant Aff."), ¶ 7, ECF No. 1; *see also* Ex. A, Aff. Supp. Search Warrant ("M.D. Pa Aff.") at pg. 76, ECF No. 1-1.  This seizure warrant did not permit a search of the contents, rather just a forensic copying of stored information. *See* M.D. Pa Aff. ¶ 141.

After promptly returning the cell phone to Rep. Perry, the government sought a separate search warrant in this Court to review the contents of the forensic extraction, in accordance with a court-authorized search protocol issued as Attachment C to the warrant. *See* D.D.C. Warrant Aff., Att. C.  As provided in this search protocol, Rep. Perry was given thirty days to first assert his privilege under the Clause with respect to any records or communications on his cell phone. *See id.* at § 2.b–d.  Attachment C provided that the government could then ask for judicial review of "the records over which Congressman Perry has asserted privilege for the Court to make a final determination whether they contain privileged information." *Id.* at § 2.d.  This Court approved the government's search warrant on August 18, 2022, finding probable cause that a crime was committed. *See* Signed D.D.C. Search Warrant at 1, ECF No. 4.  Through his counsel, the government provided Rep. Perry with a copy of the Attachment C search protocol, on August 18, 2022, followed shortly thereafter, on August 23, 2022, with a forensic extraction of the contents of his phone. Gov't's Opp'n to Rep. Perry's Mot. for Ext. of Time ("Gov't's Opp'n") at 2–3, ECF No. 8.

As the end of the review period approached—after the government had extended the initial thirty-day period by an additional fourteen days, Gov't's Opp'n at 1—Rep. Perry petitioned this Court, on October 6, 2022, for additional time to review the phone's contents and assert his privilege. *See* Rep. Perry's Mot. for Ext. of Time ("Perry Mot."), ECF No. 7. Rep. Perry explained that responsive records on his phone implicate the Clause's protections because they involve communications with his staff, members of Congress, and others, and he required additional time to review those records and create the requisite privilege log. *Id.* at 5, 9–10. He helpfully categorized the volume of records from his cell phone as follows:



*Id.* at 6.

Following the completion of briefing on Rep. Perry's motion for an extension and a hearing, held on October 18, 2022, the Court issued a scheduling order requiring Rep. Perry to provide a privilege log of the records already reviewed by 6:00 PM that day, "identifying each record by date, recipients, sender, and subject matter, as required under Attachment C to the [Signed D.D.C. Search Warrant], for the 1,041 records he has reviewed and the 33 records in the 'Notes' category of extracted information from his personal cell phone . . . that he believes are

3

subject to the Speech or Debate Clause privilege." Minute Order (October 18, 2022) ("Perry Privilege Log Order"). He was further instructed to provide to the government any records over which he did not claim privilege. *Id.* The government was instructed to submit briefing regarding (1) what records, if any, identified on Rep. Perry's October 18, 2022, privilege log it believes are not subject to the Clause's privilege; and (2) "whether (a) the Speech or Debate Clause privilege applies to communications found on the personal cell phone of a Member of Congress; (b) the presence of non-legislative third parties to communications otherwise subject to the Speech or Debate Clause privilege vitiates that privilege; (c) the crime-fraud exception is invoked here and, if so, applies to the Speech or Debate Clause privilege." *Id.* Rep. Perry was provided an opportunity to respond to the government's submission, and he was directed to "conduct review, at a rate of 800 records per business day, of the remaining 9,660 records to determine whether he asserts the Speech or Debate Clause privilege as to any record" and provide regular privilege logs to the government on every Friday beginning on October 28, 2022. *Id.*

While continuing review is underway, Rep. Perry has, so far, identified 1,120 documents that he is withholding from the government as subject to the Speech or Debate Clause privilege, notwithstanding that these documents are concededly responsive to the warrant. *See* Perry Resp. at 1.

## II.    DISCUSSION

At this stage, the parties have identified two key disputes, resolution of which is necessary to facilitate the process of fully executing the D.D.C. warrant while providing fulsome protection

for Rep. Perry's Speech or Debate privilege. First, the parties dispute whether the government can review the communications and records on Rep. Perry's phone prior to the Court evaluating each of his claims of privilege under the Clause. Second, the parties contest which one of them bears the burden of establishing whether the Clause's privilege applies.

First up is the dispute regarding the scope of the Clause's non-disclosure protections. Consistent with the Attachment C search protocol, Rep. Perry has recommended "principles" to apply in judicial "review of the information over which he has asserted Speech or Debate protection[,]" as well as made suggestions as "to the mechanics of that review." *Id.* at 11. The government, by contrast, argues that the Attachment C search protocol should be jettisoned, thereby allowing the government unfettered authority to conduct the search for responsive information on Rep. Perry's phone. *See* Gov't's Br. Regarding the Inapplicability of the Speech or Debate Cl. To Materials Seized from Rep. Perry ("Gov't's Br.") at 1, ECF No. 13. Alternatively, the government joins with Rep. Perry in requesting that judicial review of the withheld records be performed, in accordance with the Attachment C protocol, "out of an abundance of caution and to avoid litigation that would unduly delay the Government's investigation." *Id.* at 1.

Rep. Perry is right about Attachment C, insofar as he argues that the location of the targeted responsive communications and records on his personal cell phone does not mean they fall outside the protection of the Clause. The Speech or Debate Clause provides that, "in all Cases, except Treason, Felony and Breach of the Peace . . . for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place." U.S. Const. Art. I, § 6, Cl. 1. The D.C. Circuit has held that the Clause creates a non-disclosure privilege for documents and records—obtained either through a search warrant or a subpoena—that fall within the ambit of protected legislative activity. *United States v. Rayburn House Office Building, Room 2113,*

*Washington, D.C. 20515* ("*Rayburn*"), 497 F.3d 654, 656 (D.C. Cir. 2007).[1] Similar to this case, *Rayburn* involved a search warrant executed for non-legislative materials of a Member of a Congress, though it was executed in the Congressman's office. *Id.* at 655. The D.C. Circuit further held that the Executive could not review a legislator's documents and records to determine or verify which ones were privileged or not. *Id.* Thus, the legislator's rights under the Clause were violated because the search of the legislator's office "must have resulted in the disclosure of legislative materials to agents of the Executive." *Id.* at 661. The Court was critical of "[t]he special procedures outlined in the warrant affidavit" for failing to "avoid[] the violation of the Speech or Debate Clause because they denied the Congressman any opportunity to identify and assert the privilege with respect to legislative materials before their compelled disclosure to Executive agents." *Id.* at 662; *see also id.* (explaining that "incidental review . . . does not deny that compelled review by the Executive occurred, nor that it occurred in a location where legislative materials were inevitably to be found, nor that some impairment of legislative deliberations occurred").

Although recognizing that *Rayburn* is binding in this Circuit, the government urges this Court to find that Attachment C's search protocol guidelines are not constitutionally required, for two reasons. First, it says that legislative materials were inevitably to be found in *Rayburn* because the search and seizure in that case occurred in the congressional office of a sitting Member of Congress, while the search of Rep. Perry's phone, by contrast, does not pose that same risk. Gov't's Br. at 8. Second, it claims that *Rayburn* rests its reasoning on the fact that a search and

---

[1]     Notably, the Third and Ninth Circuits disagree with *Rayburn*'s approach, holding that the Speech or Debate "privilege when applied to records or third-party testimony is one of nonevidentiary use, not of non-disclosure." *See In re Grand Jury Investigation*, 587 F.2d 589, 597 (3d Cir. 1978); *United States v. Renzi*, 651 F.3d 1012, 1032 (9th Cir. 2011) (rejecting the contention "that there exists some grandiose, yet apparently shy, privilege of non-disclosure that the Supreme Court has not thought fit to recognize").

seizure of files from a Congressman's office is highly likely to cause disruption, but the government's seizure of Rep. Perry's phone for a few hours, coupled with a forensic search of his phone, did not similarly impair the Congressman's ability to complete his legislative work. *Id.* at 9.

These are valid distinctions from the circumstances in *Rayburn*, but prudence dictates compliance with Attachment C. Certainly, the government's seizure and forensic imaging of Rep. Perry's phone was much less disruptive than the search at issue in a congressman's official office in *Rayburn*, but potentially some of a Member's communications on his personal cell phone— particularly with aides or other legislators—will be part of or integral to legislative acts or the motivations behind legislative acts. Even if the *Rayburn* search "must have resulted in the disclosure of legislative materials" because the government seized physical documents in the Congressman's office, 497 F.3d at 661, *Rayburn* is written sufficiently broadly to contemplate that a Member's text or email communications with his staff or other legislators on his cell phone regarding an upcoming vote, speech notes on an upcoming floor speech, or questions prepared for a witness at an upcoming committee meeting, enjoy the same nondisclosure protection. *Cf. Riley v. California*, 573 U.S. 373, 393 (2014) ("Cell phones differ in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's person. . . . [T]hese devices are in fact minicomputers that also happen to have the capacity to be used as a telephone. They could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers."). [2]   As the D.C. Circuit articulated the rationale for

---

[2]     Indeed, Rep. Perry notes that a Member is permitted to connect her personal cell phone to the House infrastructure, Perry Resp. at 6, but the government points out that Rep. Perry has not done so. Reply at 3–4. Despite the target cell phone's lack of formal connection to the House infrastructure, *Rayburn*'s non-disclosure requirement still dictates that the Attachment C protocol be followed, considering the significant number of communications that Rep. Perry has with other Members, their staff, and his own staff. *See* Perry Mot. at 7. The special protection that *Rayburn*'s non-disclosure provision affords to Members—putting them in an automatically privileged position and

non-disclosure of information subject to the Clause's privilege, the ability for the Executive to

review these documents and records "may legitimately involve frank or embarrassing statements;

the possibility of compelled disclosure may therefore chill the exchange of views with respect to

legislative activity. This chill runs counter to the Clause's purpose of protecting against disruption

of the legislative process." *Rayburn*, 497 F.3d at 661.

 Given that the government's search of Rep. Perry's cell phone could touch on those

protected materials, the Clause's non-disclosure privilege applies under *Rayburn* and Attachment

C must be followed to prevent the release of privileged communications to the government. *Id.* at

663 (citation omitted) ("[A] search that allows agents of the [government] to review privileged

materials without the Member's consent violates the Clause . . . , but [the government's] copying

of computer hard drives and other electronic media is constitutionally permissible because . . . the

Congressman [then has] an opportunity to assert the privilege prior to disclosure of privileged

materials to the Executive[.]").[3]

 Finally, the parties disagree on which one of them bears the burden of establishing the

applicability of the Clause's privilege to any given communication or record. The government

says that burden lies with Rep. Perry as the holder of the privilege, Gov't's Br. at 10, while Rep.

Perry believes that the government should carry the burden. Perry Resp. at 8.

---

allowing them, like Rep. Perry has done here, unilaterally to delay criminal investigations—is indeed a troubling
outcome of the D.C. Circuit's decision, but the decision is nonetheless binding on this Court.

[3] In reply, the government claims that *Rayburn* rests its decision on the fact that legislative materials would
"inevitably to be found." Gov't's Reply in Support of Gov't's Br. ("Reply") at 2–3, ECF No. 17 (quoting *Rayburn*,
497 F.3d at 661). Even if the presence of legislative materials is less likely on a Member's personal cell phone—a
dubious suggestion given the fact that modern-day cell phones are ubiquitous and particularly necessary for
congresspeople required to travel to and from the U.S. Capitol and their home districts—the presence of such materials
in such a mobile "location" is a concrete reality here, and thus the act of disclosure to the government would run
counter to *Rayburn*'s command that records covered by the Clause's protections should not be revealed to the
Executive in the first place.

Rep. Perry bears the burden of showing that the legislative privilege obtains over all records and communications. *See United States v. Rostenkowski*, 59 F.3d 1291, 1300 (D.C. Cir. 1995) (concluding that a Congressman seeking dismissal of an indictment on Speech or Debate grounds bears the "burden" of "show[ing] that the Government has relied upon privileged material"); *see also In re Subpoena Duces Tecum Issued to Commodity Futures Trading Comm'n*, 439 F.3d 740, 750 (D.C. Cir. 2006) ("It is well established that the proponent of a privilege bears the burden of demonstrating facts sufficient to establish the privilege's applicability."). Given that Rep. Perry is asserting a use privilege personal to him, and since only he has possession of the records and communications he claims are privileged, the burden of persuasion—by a preponderance of the evidence—falls on him. *See In re Grand Jury Investigation*, 587 F.2d at 597. Nowhere in *Rangel v. Boehner*, which is relied upon by Rep. Perry, *see* Perry Resp. at 8, does the D.C. Circuit address which party, the government or the privilege holder, bears the burden of proof as to the applicability of the privilege. *See* 785 F.3d 19 (D.C. Cir. 2015). *Rangel* instead stands for the principle that a party invoking a court's jurisdiction bears the burden of establishing the court's subject-matter jurisdiction, an entirely different inquiry. *See, e.g.*, *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).[4] Considering that the government cannot even access to the communications and records over which Rep. Perry claims privilege until a judicial determination that the privilege does not apply, the government plainly cannot bear the burden of establishing that result. *See* Reply at 5.

Finally, the pace of compliance with the Perry Privilege Log Order is concerning. The government notes that Rep. Perry has, "[n]ine business days after the Court's order, [reviewed]

---

[4]    Based on Rep. Perry's briefing, the Court assumes that Rep. Perry does not challenge this Court's subject matter jurisdiction. *See* Perry Resp. at 8 (arguing that, under *Rangel* and other cases, the government, "[a]s the party seeking to pierce a constitutional immunity, . . . bears the burden to show the activity is not protected").

less than 2,400 additional documents[,] . . . resulting in an average review pace of approximately

265 documents per day." *Id.* at 2, n.1.  Considering the government's interests in obtaining Rep.

Perry's non-privileged communications and records and records in an expedient manner, while

balancing Rep. Perry's interests in preserving his privilege under the Clause, this Court ordered

Rep. Perry to review documents at a pace of 800 documents per day, *see* Perry Privilege Log

Order, as his counsel had confirmed at the October 18, 2022, hearing he was able to accomplish,

*see* October 18, 2022 Hearing Tr. at 60:24 ("We will get 800 a day done, sure.").  If Rep. Perry

has indeed significantly deviated from the pace required under the Perry Privilege Log Order, and

he continues to slow-walk producing privilege logs to the government—particularly considering

that the government had previously granted him a fourteen-day extension, and even more time to

complete his privilege review was provided in the Perry Privilege Log Order—he risks forfeiting

his right to assert his privilege.  *See Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Ct. for Dist. of

Mont.*, 408 F.3d 1142, 1146–47 (9th Cir. 2005) (explaining that under Federal Rules of Civil

Procedure 26(b)(5) and 34, failure to properly and timely provide privilege logs risks a party

waiving the ability to assert her privilege); *Porter v. City & Cty. of San Francisco*, No. 16-cv-

03771, 2018 WL 4215602, at *6 (N.D. Cal. Sept. 5, 2018) ("Although waiver is a harsh sanction,

courts have not hesitated to find waiver where a party repeatedly engages in inexcusable or

unjustifiable conduct."); *Mauna Kea Resort, LLC v. Affiliated FM Ins. Co.*, No. CV 07-00605,

2009 WL 10677201, at *4 (D. Haw. June 24, 2009) ("While a failure to meet this deadline will

not automatically result in a waiver of privilege, repeated failures to abide by Court orders and/or

fulfill discovery obligations may result in a finding of waiver of privilege in the future."); *Loop AI

Labs Inc. v. Gatti*, No. 15-CV-00798-HSG, 2016 WL 2908415, at *3 (N.D. Cal. May 13, 2016)

(finding waiver where a party repeatedly and unjustifiably failed to comply with the court's order

to provide an adequate privilege log).  Rep. Perry is now on notice to speed up his review, in compliance with the Perry Privilege Log Order, or face the consequence of forfeiting protection.

In sum, although *Rayburn* requires the Court to follow Attachment C's procedures, Rep. Perry bears the burden of showing, by a preponderance of the evidence, that the Clause's protections apply to every record or communication over which he claims privilege.  After Rep. Perry has been given the opportunity to supplement his claims of privilege under the Clause, he will submit, on a rolling basis, all the records and communications over which he claims privilege for *in camera* review to determine whether the Clause's protections apply.[5]

## III.    ORDER

For the foregoing reasons, it is hereby

**ORDERED** that the government, by **November 14, 2022**, advise the Court which documents and records in Rep. Perry's privilege logs, which were due by October 18, 28 and November 4, 2022, *see* Perry Privilege Log Order ¶¶ A(1) and C, that they dispute as privileged under the Clause; it is further

**ORDERED** that Rep. Perry, by **November 16, 2022**, furnish the Court with all disputed records and communications by:

1.  assigning each such record and any communication in the same chain, together with any attachments, an exhibit number;

2.  providing the Court with:

    a.  a thumb drive with electronic versions of the exhibits, with each exhibit saved as a separate file and organized into folders reflecting the categories into which

---

[5]     While helpful, the government and Rep. Perry's briefing on the scope and potential applicability of the Clause to Rep. Perry's cell phone records and communications is, at this stage, too hypothetical.  Only after the Court has had the opportunity to evaluate Rep. Perry's claims of privilege with respect to each record or communication can a conclusion be reached as to whether that record or communication is protected.

Rep. Perry has already sorted the documents, namely

 

   b.  one set of binders with hard copies of each exhibit, also sorted by Rep. Perry's categories, and

   c.  an Excel spreadsheet detailing the following for each exhibit submitted for review:

       i.  exhibit number

      ii.  Bates number(s), if any

     iii.  document type (i.e., text, email, Notes app file)

     iv.  date

      v.  recipient(s)

     vi.  sender

    vii.  proposed category, and

   viii.  any additional information concerning the communication, if necessary; and

3.  submitting a motion for withholding as subject to the Speech or Debate Clause privilege that explains Rep. Perry's claims of privilege as to each exhibit; it is further

**ORDERED** that, by **November 18, 2022,** the parties (1) propose a schedule for rolling productions of exhibits for *in camera* review of disputed privilege logs; and (2) provide a report on the status of Rep. Perry's compliance with the Perry Privilege Log Order.

**SO ORDERED**.

Date: November 4, 2022

_Beryl A. Howell_
_____

BERYL A. HOWELL
Chief Judge

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE FORENSIC COPY OF THE CELL PHONE OF REPRESENTATIVE SCOTT PERRY | Case No. 22-sc-2144 |
| | Chief Judge Beryl A. Howell |
| | **UNDER SEAL** |

## MEMORANDUM OPINION

Harkening back to its sister clause in the English Bill of Rights of 1689, the Speech or Debate Clause of the U.S. Constitution ("the Clause"), *see* U.S. CONST. art. I, § 6, cl. 1., was designed to ensure the independence of the legislature and enforce the separation of powers. *United States v. Johnson*, 383 U.S. 169, 178 (1966).[1] Members of Congress making impassioned speeches on the floor of the House or Senate chambers or having frank deliberations among themselves or legislative staff about legislative matters, with such activities potentially accompanied by the expression of harsh, offensive and even slanderous critiques or potentially illegal proposals, were among the Framers' concerns in drafting the Clause to protect those legislators "against possible prosecution by an unfriendly executive and conviction by a hostile judiciary." *Id.* at 179. Those foundational concerns for our tripartite federal government must be applied today in considering the extent to which the Speech or Debate Clause shields disclosure of records on a Member's personal cell phone when those records are responsive to a probable cause search warrant issued in connection with an ongoing grand jury investigation.

---

[1] *See Kilbourn v. Thompson*, 103 U.S. 168, 202 (1880) (summarizing British historical precedent as follows: "When, however, the revolution of 1688 expelled the last of the Stuarts and introduced a new dynasty, ... a bill of rights [was] formally declared by the Parliament and assented to by the crown. One of these declarations is 'that the freedom of speech, and debates, and proceedings in Parliament, ought not to be impeached or questioned in any court or place out of Parliament.'" (internal citations omitted)).

The Member in question is Congressman Scott Perry ("Rep. Perry"), who has represented the Commonwealth of Pennsylvania's Tenth Congressional District since January 2013. *See* Rep. Perry's Resp. to the Gov't's Brief Regarding the Applicability of the Speech or Debate Clause ("Perry Resp.") at 4, ECF No. 15. Rep. Perry is also a member of, and the recently elected Chairman for, the House Freedom Caucus ("HFC"), whose mission, in part, is "to give a voice to countless Americans who feel that Washington does not represent them." Rep. Perry's Mot. for Non-Disclosure to the Gov't ("Perry Mot.") at 2, ECF No. 21

As part of a grand jury investigating potential federal criminal law violations stemming from efforts to overturn the 2020 presidential election, the government uncovered evidence of Rep. Perry using his personal cell phone to communicate with individuals allegedly engaged in those efforts over critical time periods at issue in the investigation. In pursuing the criminal investigation, the government obtained and executed a probable cause warrant issued by a magistrate judge in the Middle District of Pennsylvania to seize Rep. Perry's personal cell phone and forensically extract an image of its contents in August 2022, after which extraction the cell phone was promptly returned to Rep. Perry. *See* Aff. of Federal Bureau of Investigation ("FBI") Special Agent in Support of Appl. for Search Warrant (dated Aug. 18, 2022) ("D.D.C. Warrant Aff."), ¶ 7, ECF No. 1; *see also* M.D. PA Warrant (authorized August 2, 2022), ECF No. 23. The government then sought a separate search warrant to review the contents of the forensic extraction, in accordance with a proposed search protocol designed to protect Rep. Perry's privilege under the Clause, which warrant, along with the search protocol, as Attachment C, were ultimately approved by this Court. *See* D.D.C. Appl. for Search Warrant (dated Aug. 18, 2022), ECF No. 1; D.D.C. Warrant (authorized Aug. 18, 2022) ("D.D.C. Warrant"), Att. C, ECF No. 4.[2] In accordance with

this search protocol, Rep. Perry was provided the opportunity, before any government access to the contents of his cell phone, to assert his privilege under the Speech or Debate Clause. *See id.* at § 2.b–d. He has now done so and seeks to block the government's review of 2,219 responsive records, claiming privilege under the Clause. *See* Perry Mot. at 4; *see also* Rep. Perry's *Ex parte* Suppl. to His Mot. for Nondisclosure ("Perry Suppl. (*ex parte*)"), ECF No. 22.

The government, without having seen the withheld records but mindful of the critical context that the task of executing the D.D.C. Warrant focuses solely on records responsive to the warrant and that, while broad, the Clause's coverage is not unfettered, contests the withholding of these records and requests *in camera* review to assess the appropriateness of Rep. Perry's withholding. *See* Gov't's Objs. to Rep. Perry's Priv. Assertions ("Gov't's Mem"), ECF No. 19.

Following *in camera* review of 2,219 documents over which Rep. Perry claims privilege, along with his accompanying motion and *ex parte* supplement explaining the bases for his claims of privilege, the Court concludes that few of these withheld records are protected by the Clause. Specifically, 2,055 of the 2,219 responsive records are not privileged under the Clause and thus



3

must be disclosed to the government, with the remaining 161 records properly withheld in full and three records in part.

Accordingly, as further explained below, Rep. Perry's motion to withhold from the government access to certain responsive records on his cell phone is **GRANTED IN PART AND DENIED IN PART**.

## I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Resolution of Rep. Perry's claims of privilege under the Clause has, thus far, proceeded in three phases: (1) issuance and execution of the M.D. PA and D.D.C. Warrants for the contents of Rep. Perry's personal cell phone; (2) Rep. Perry's invocation of the Clause to withhold information on his cell phone from law enforcement scrutiny and subsequent initiation of judicial involvement in execution of the D.D.C. Warrant; and (3) Rep. Perry's submission of over two thousand responsive records for *in camera* review of applicability of the Clause.  Each phase is discussed *seriatim*.

### A. Issuance and Execution of Search Warrants

As already noted, a warrant to seize Rep. Perry's personal cell phone was issued by a magistrate judge in the Middle District of Pennsylvania and executed on August 9, 2022, when the Federal Bureau of Investigation ("FBI") forensically extracted an image of the phone's contents. *See* D.D.C. Warrant Aff., ¶ 7; *see also* M.D. PA Warrant.  This seizure warrant did not permit a search of the phone's contents, but rather only a forensic copying or extraction of information on the phone. *See* Aff. of FBI Special Agent in Support of Appl. for M.D. PA Search Warrant ¶ 141, ECF No. 1-1.  After promptly returning the cell phone to Rep. Perry, the government sought a separate search warrant in this Court to review the contents of the forensic extraction, in accordance with a search protocol appended as Attachment C to the warrant. *See* D.D.C. Warrant,

Att. C at § 1; D.D.C. Warrant Aff. at 9 ¶ 1 ("I have been informed by the Prosecutors overseeing the investigation in this matter that they have decided to adopt special procedures in light of the possibility the forensic extraction of the Device . . . contains materials created that are protected by the Speech or Debate Privilege[.]").[3]  After a determination that there was probable cause to believe that evidence of criminal activity would be found on the targeted cell phone, the government's search warrant was approved on August 18, 2022.  D.D.C. Warrant at 1.

The government provided Rep. Perry, through his counsel, with a copy of the Attachment C protocol, on August 18, 2022, followed shortly thereafter, on August 23, 2022, with a forensic extraction of the contents of the phone.  Gov't's Opp'n to Rep. Perry's Mot. for Ext. of Time at 2–3, ECF No. 8.  As provided in the Attachment C protocol, Rep. Perry was given thirty days to first assert his privilege—or not—under the Clause with respect to any information on his cell phone.  *See* D.D.C. Warrant, Att. C at § 2.b–d.  Attachment C provided that the government could then ask for judicial review of "the records over which Congressman Perry has asserted privilege for the Court to make a final determination whether they contain privileged information."  *Id.* at § 2.d.

### B. Rep. Perry's Initiation of Judicial Involvement in Execution of D.D.C. Warrant

As the end of the review period approached—after the government had extended the initial thirty-day period by an additional fourteen days at Rep. Perry's request, Gov't's Opp'n at 1—Rep. Perry petitioned this Court, on October 6, 2022, for additional time to review the phone's contents and assert privilege under the Clause.  *See* Rep. Perry's Mot. for Ext. of Time, ECF No. 7.  Rep.

Perry explained that responsive records on his phone implicate the Clause's protections because they involve communications with his staff, members of Congress, and others, and he required additional time to review those records and create the requisite privilege log. *Id.* at 5, 9–10.

Following the completion of briefing on Rep. Perry's motion for an extension and a sealed hearing, held on October 18, 2022, a scheduling order was issued that required Rep. Perry to provide a privilege log of the records already reviewed by 6:00 PM the same day, "identifying each record by date, recipients, sender, and subject matter, as required under Attachment C to the [D.D.C. Search Warrant], for the 1,041 records he has reviewed and the 33 records in the 'Notes' category of extracted information from his personal cell phone . . . that he believes are subject to the Speech or Debate Clause privilege." Minute Order (October 18, 2022) ("Perry Privilege Log Order"). He was further instructed to provide to the government any records over which he did not claim privilege, and to "conduct review, at a rate of 800 records per business day, of the remaining 9,660 records to determine whether he asserts the Speech or Debate Clause privilege as to any record" and provide regular privilege logs to the government on every Friday beginning on October 28, 2022. *Id.* The Perry Privilege Log Order also directed the parties to address several legal issues concerning their respective views on the scope of the Speech or Debate Clause privilege.[4]

The parties' briefing, while Rep. Perry's privilege review was underway, highlighted two threshold disputes. First, the parties disputed whether, under *Rayburn House Office Building,*

---

[4]     These issues included: "whether (a) the Speech or Debate Clause privilege applies to communications found on the personal cell phone of a Member of Congress; (b) the presence of non-legislative third parties to communications otherwise subject to the Speech or Debate Clause privilege vitiates that privilege; (c) the crime-fraud exception is invoked here and, if so, applies to the Speech or Debate Clause privilege." Perry Privilege Log Order. Both parties agreed that the Clause could apply to communications found on a Member's personal cell phone, the presence of third parties does not vitiate the privilege, and that no crime-fraud exception to the Clause exists. Gov't's Br. Re. Inappl. of Speech or Debate Cl. Priv. at 11–13, ECF No. 13; Perry Resp. at 8–10.

6

*Room 2113, Washington, D.C. 20515*, 497 F.3d 654 (D.C. Cir. 2007) ("*Rayburn*"), the procedures outlined in Attachment C could be jettisoned, particularly considering the already three-month delay in executing the warrant to provide the government access to responsive records on Rep. Perry's cell phone compounded by the further delay *in camera* review of contested documents would pose. *Compare* Gov't's Br. Re. Inappl. of Speech or Debate Cl. Priv. ("Gov't's Resp.") at 3 ("The procedures in Attachment C are not constitutionally required, nor are they compelled by the D.C. Circuit's decision in *Rayburn*. The Court should so rule and hold that the Government is entitled to access the records on Rep. Perry's phone without regard to those procedures."), ECF No. 13, *with* Perry Resp. at 1 ("Rep. Perry respectfully seeks the Court's review pursuant to the process specified in Attachment C of the warrant."). Second, the parties disputed whether Rep. Perry, as the privilege holder, or the government bears the burden of establishing whether the Clause's privilege applies. *Compare* Gov't's Resp. at 10 ("Rep. Perry bears the burden of proving that the Speech or Debate privilege applies to the documents for which he seeks protection."), *with* Perry Resp. at 8 ("[I]t is the Government's burden to demonstrate that its protections do not apply.").

As to the first issue, the procedures outlined in Attachment C were deemed prudent to follow "to prevent the release of privileged communications to the government" because "*Rayburn* is written sufficiently broadly to contemplate that" information on a Member's personal cell phone could touch on protected materials, and "the Clause's non-disclosure privilege applies under *Rayburn* and Attachment C must be followed to prevent the release of privileged communications to the government." Mem. Op. & Ord. (Nov. 4, 2022) ("Nov. 2022 Order") at 7–8, ECF No. 18 (citing *Rayburn*, 497 F.3d at 663 ("[W]e hold that a search that allows agents of the Executive to review privileged materials without the Member's consent violates the Clause. The Executive's

7

search of the Congressman's paper files therefore violated the Clause, but its copying of computer hard drives and other electronic media is constitutionally permissible because the Remand Order affords the Congressman an opportunity to assert the privilege prior to disclosure of privileged materials to the Executive[.]")).[5]  As to the second issue, the Nov. 2022 Order made clear that Rep. Perry bears the burden of establishing that specific records or communications should be withheld from the government under the Clause.  Nov. 2022 Order.

Finally, the order outlined the process for resolving any disputed privilege claims made by Rep. Perry.  In this regard, Rep. Perry was directed to furnish any disputed records over which he claimed privilege for *in camera* review, with those withheld records sorted into the following categories he had initially proposed



---

[5]      The "Remand Order" referenced in the D.C. Circuit's quoted language had been issued by that Court in response to an emergency motion for a stay pending appeal filed by the congressman whose House office had been searched, *Rayburn*, 497 F.3d at 658, and required that the congressman be provided with "copies of computer files made by [the Executive]," and "an opportunity to review the records" tagged as responsive through a keyword search "for the terms listed in the warrant," *id.* Any such responsive records that the congressman "identified as legislative" had to be reviewed *in camera* by the district court to "make findings regarding whether the specific documents or records are legislative in nature," *id.* (quoting Remand Order), while the Executive was enjoined "from reviewing any of the seized documents pending further order" of the court or unless the congressman conceded the records were not privileged under the Speech or Debate Clause, *id.* The D.C. Circuit's Remand Order rejected the original "special procedures" approved by the district court as part of the warrant to use a government "filter team" to identify and remove privileged and nonresponsive records from materials turned over to the investigative team, *id.* at 656-57, because "[t]he special procedures outlined in the warrant affidavit would not have avoided the violation of the Speech or Debate Clause because they denied the Congressman any opportunity to identify and assert the privilege with respect to legislative materials before their compelled disclosure to Executive agents," *id.* at 662.

The government timely filed its objections to Rep. Perry's claimed privilege over 2,627 records, contending that none of these responsive records were likely integral to a legislative act or performed in a sufficiently procedurally regular fashion to constitute legitimate legislative activity. Gov't's Mem. at 1–2. Rep. Perry confirmed that, upon completion of his privilege review, out of a total of 9,462 responsive documents on his cell phone, he identified 2,627 responsive documents as privileged under the Clause. Rep. Perry's Resp. to the Gov't's Objs. and Req. for Mod. of the Court's Nov. 2022 Order at 1, ECF No. 20. He requested an unopposed extension to ensure all privileged documents were accurately tagged as privileged and in accordance with the five categories outlined in the Nov. 2022 Order, and requested certain modifications to the manner of furnishing the records for *in camera* review. *Id.* at 6–7. The extension and modifications requested by Rep. Perry were largely granted. *See* Minute Order (Nov. 16, 2022).

### C. Rep. Perry's Submission of Responsive Records for *In Camera* Review

On November 28, 2022, Rep. Perry submitted for *in camera* review 2,219 responsive records, Perry Mot. at 4, which was slightly fewer than originally estimated, with an accompanying motion and *ex parte* submission, *see* Perry Suppl. (*ex parte*).

To categorize communications accurately while keeping strings of communications together, Rep. Perry provided responsive records organized into fifteen sub-categories, Perry Mot. at 5, which include combinations of the five broader categories initially outlined by Rep. Perry, *see* Perry Resp. at 2, and a so-called "other" category of responsive records, *see* Perry Mot. at 5. This sub-categorization has also been helpful to facilitate *in camera* review. The fifteen sub-categories, and the number of unique responsive records in each, are listed below, in A through O:

9



Perry Mot. at 5.

With *in camera* review of the 2,219 contested responsive records completed, Rep. Perry's motion to withhold responsive records is now ripe for resolution.

## II.    DISCUSSION

Rep. Perry contends that he is entitled to withhold as privileged under the Clause 2,219 responsive records spanning his communications not only with fellow congressional Members and staff, but also with private individuals and officials with no formal role or function in the United States Congress                                                        Perry Mot. at 4.  He articulates a broad reach of the non-disclosure aspect of the Speech or Debate Clause privilege to block access in a criminal investigation to any communications he had with any person in any capacity when "he was engaged in information gathering that is 'part of, in connection with, or in aide of a legitimate legislative act' . . . even where it is an informal effort undertaken by an individual Member of Congress or their staff." *Id.* at 6 (quoting *McSurely v. McClellan*, 553 F. 2d 1277, 1286 (D.C. Cir. 1976)).

This astonishing view of the scope of the legislative privilege would truly cloak Members of Congress with a powerful dual non-disclosure and immunity shield for virtually any of their activities that could be deemed information gathering about any matter which might engage legislative attention. At the same time, a Member could delay, if not effectively bar, investigative scrutiny and avoid not only criminal or civil liability but also the public reputational harm that such scrutiny could engender, particularly in the view of voters. To be sure, communications that a congressional Member has "attending to human needs or interests not peculiar to a Congress member's work *qua* legislator may advance a member's general welfare"—and even his professional and public profile—but to characterize such communications as "'legislative' in character[ ] is to stretch the meaning of that word beyond sensible proportion." *United States v. Rostenkowski*, 59 F.3d 1291, 1302–03 (D.C. Cir. 1995).

The Clause does not protect extra-legislative communications that are only tangential to matters coming before the Congress, and most of the responsive records withheld by Rep. Perry are merely that. Only 164 responsive records containing communications exclusively with Members of Congress and legislative staff reflect an "integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House," *Gravel v. United States*, 408 U.S. 606, 625 (1972), and thereby qualify for the Clause's protection, in whole or in part. As such, those records are properly withheld. The remaining records reflecting his communications with ███████████████ do not qualify as privileged and must be disclosed to the government.

11

Following discussion of the general legal principles governing the scope of the Speech or Debate Clause privilege, the different categories of withheld records are described and then analyzed for application of the Clause's protections.

### A. Overview of the Speech or Debate Clause

The Speech or Debate Clause provides that, "for any Speech or Debate in either House, [the Senators and Representatives] shall not be questioned in any other Place." U.S. CONST. art. I, § 6, Cl. 1. James Wilson, who participated in the drafting of the U.S. Constitution before serving as one of the first Associate Supreme Court Justices, explained that the privilege is rooted in the "'indispensabl[e] necess[ity]'" for Members of Congress to "'enjoy the fullest liberty of speech'" and "'protect[ion] from the resentment of everyone, however powerful, to whom the exercise of that liberty may occasion offence[,]'" so the members can faithfully "discharge [his or her] public trust with firmness and success." *Tenney v. Brandhove*, 341 U.S. 367, 373 (1951) (quoting Works of James Wilson (Andrews ed. 1896) 38)). Inclusion of the Clause in the U.S. Constitution was considered not only indispensable but was also uncontroversial since the Constitutional convention approved the Clause and ratification proceeded without any apparent disagreement about this provision. *In re Grand Jury Subpoenas*, 571 F.3d 1200, 1204 (D.C. Cir. 2009) (Kavanaugh, J., concurring) (citing Josh Chafetz, *Democracy's Privileged Few* 74, 87–88 (2007); Joseph Story, 1 *Commentaries on the Constitution of the United States* § 863 (1833)) (discussing origin of the Clause).

Ensuring "the independence and integrity of the legislature" by "protecting against possible prosecution by an unfriendly executive and conviction by a hostile judiciary" also "serves the additional function of reinforcing the separation of powers so deliberately established by the Founders." *Johnson*, 383 U.S. at 178–79; *see also United States v. Helstoski*, 442 U.S. 477, 491–

92 (1979) (citation and quotation marks omitted) ("There is little doubt that the instigation of
criminal charges against critical or disfavored legislators by the executive in a judicial forum was
the chief fear prompting the long struggle for parliamentary privilege in England and, in the context
of the American system of separation of powers, is the predominate thrust of the Speech or Debate
Clause[,]" whose "purpose was to preserve the constitutional structure of separate, coequal, and
independent branches of government."); *Lake Country Ests., Inc. v. Tahoe Reg'l Plan. Agency*,
440 U.S. 391, 404–05 (1979) (quotation marks omitted) (explaining that the Clause makes
legislators "immune from deterrents to the uninhibited discharge of their legislative dut[ies], not
for their private indulgence but for the public good"); *McCarthy v. Pelosi*, 5 F.4th 34, 38 (D.C.
Cir. 2021) (quotation marks and citation omitted) (explaining that the Clause's "central object . . .
is to protect the 'independence and integrity of the legislature. . . by preventing intimidation of
legislators by the Executive and accountability before a possibly hostile judiciary"). As then-Judge
Kavanaugh succinctly stated, "the Clause helps maintain the separation of powers among the three
Branches." *In re Grand Jury Subpoenas*, 571 F.3d at 1204 (Kavanaugh, J., concurring).

The Supreme Court first opined on the scope of the Clause in *Kilbourn v. Thompson*. The
crux of the issue in *Kilbourn* was whether the Clause could shield members of the House of
Representatives from liability on a civil claim of false imprisonment asserted by a witness who
refused to answer questions and produce documents about his business interests. The Court
answered in the affirmative, declining "a narrow view of the constitutional provision to limit it to
words spoken in debate[,]" and reading the Clause more broadly "as forcible in its application to
written reports presented in that body by its committees, to resolutions offered, which, though in
writing, must be reproduced in speech, and to the act of voting, whether it is done vocally or by
passing between the tellers[,]" or "[i]n short, to things generally done in a session of the House by

13

one of its members in relation to the business before it." *Kilbourn*, 103 U.S. at 204; *see also id.* (citing as the "most authoritative case in this country on the construction of the provision in regard to freedom of debate in legislative bodies, and being so early after the formation of the Constitution of the United States, is of much weight[,]" a 1808 Massachusetts Supreme Court decision, describing scope of State Constitution's version of Clause as not "confine[d] [ ] to delivering an opinion, uttering a speech, or haranguing in debate, but" also extending "to the giving of a vote, to the making of a written report, and to every other act resulting from the nature and in the execution of the office").

Consistent with its first take in *Kilbourn*, the Supreme Court has since read the Clause "broadly to effectuate its purposes[.]" *Johnson*, 383 U.S. at 180; *see also Hutchinson v. Proxmire*, 443 U.S. 111, 124 (1979) ("[T]he Court has given the Clause a practical rather than a strictly literal reading[.]"). To this end, the Supreme Court has further held that when the Clause's protections attach, its privileges are absolute. *See Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 503 (1975) ("[O]nce it is determined that Members are acting within the 'legitimate legislative sphere' the Speech or Debate Clause is an absolute bar to interference."); *Rayburn*, 497 F.3d at 661.

Supreme Court jurisprudence makes clear that the Clause provides Members of Congress two substantive protections for their legislative acts. First, "Congressmen and their aides are immune from liability for their actions within the 'legislative sphere,' even though their conduct, if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes." *Doe v. McMillan*, 412 U.S. 306, 312–13 (1973) (quoting *Gravel*, 408 U.S. at 624–25); *see also In re Grand Jury Proc.*, 563 F.2d 577, 584 (3d Cir. 1977) (characterizing the Clause as providing a "nonevidentiary use privilege" that "permits legislative action, as well as free and unfettered legislative debate, without exposing the legislator to criminal

liability").[6]  Second, the Clause ensures that Members "may not be made to answer" questions

about their legislative acts, including in person before a grand or petit jury, *Gravel*, 408 U.S. at

616, though a Member may be called to "testify[] at trials or grand jury proceedings involving

*third-party* crimes where the questions do not require testimony about or impugn a legislative act,"

*id.* at 622 (emphasis added); *id.* at 626 (holding that a Member was required to testify about his

role in private republication of the Pentagon Papers, because his acts involving that publication

"were not part and parcel of the legislative process").

      In combination, these two substantive Clause protections preclude questioning of

congressional Members (and staff) about legislative acts or using such acts against them in either

civil or criminal matters, no matter how corrupt the motivation may be for the legislative activity

at issue. *See, e.g.*, *Johnson*, 383 U.S. at 180 (explaining that where "[t]he essence of such a charge

. . . is that the Congressman's conduct was improperly motivated, . . . that is precisely what the

Speech or Debate Clause generally forecloses from executive and judicial inquiry"); *Tenney*, 341

U.S. at 377 (explaining that "[t]he claim of an unworthy purpose does not destroy the privilege"

and "that it was not consonant with our scheme of government for a court to inquire into the

motives of legislators"); *Eastland,* 421 U.S. at 508 ("Our cases make clear that in determining the

legitimacy of a congressional act we do not look to the motives alleged to have prompted it."). In

---

[6]     Notably, in *Kilbourn*, Supreme Court reserved decision over whether "there may not be things done, in the one House or the other, of an extraordinary character, for which the members who take part in the act may be held legally responsible" should "the members of these bodies so far to forget their high functions and the noble instrument under which they act," explaining, "we are not prepared to say that such an utter perversion of their powers to a criminal purpose would be screened from punishment by the constitutional provision for freedom of debate."  103 U.S. at 204–05. *See also Cushing v. Packard*, 30 F.4th 27, 50 (1st Cir. 2022) (quotation marks omitted) (noting that "[i]n line with *Kilbourn*, we have recognized that that there may be some conduct, even within the legislative sphere, that is so flagrantly violative of fundamental constitutional protections that traditional notions of legislative immunity would not deter judicial intervention"). The government has not sought here to exploit this reservation to the Clause's protection for egregious legislative conduct, and thus, the pending motion presents no occasion to consider whether any such exception applies.

sum, "[i]t is beyond doubt that the Speech or Debate Clause protects against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts." *United States v. Brewster*, 408 U.S. 501, 525 (1972); *Helstoski*, 442 U.S. at 487 (explaining that its precedents "leave no doubt that evidence of a legislative act of a Member may not be introduced by the Government").

Despite the significant protections provided under the Clause to congressional Members (and staff), the Supreme Court has made clear that the Clause is no "get out of jail free" card. Indeed, "a Member of Congress may be prosecuted under a criminal statute provided that the Government's case does not rely on legislative acts or the motivation for legislative acts," *Brewster*, 408 U.S. at 512, since this privilege was "not written into the Constitution simply for the personal or private benefit of Members of Congress," *id.* at 507. "The privilege is not designed to protect the reputations of congressmen but rather the functioning of Congress." *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 419 (D.C. Cir. 1995); *see also id.* at 418–19 (quotation marks omitted) (explaining the term "integrity" in the phrase "integrity of the legislative process" is used "not in the sense of reputation for rectitude but rather in the sense of a state of being unimpaired"). As then-Judge Ruth Bader Ginsberg summed up, "[t]he key consideration, Supreme Court decisions teach, is the act presented for examination, not the actor." *Walker v. Jones*, 733 F.2d 923, 929 (D.C. Cir. 1984).

This crucial focus on the "legislative act" significantly restricts the scope and applicability of the Clause. The Supreme Court "has repeatedly insisted that the Speech or Debate Clause is subject to 'finite limits,' refusing to stretch its protective umbrella 'beyond the legislative sphere' to conduct not 'essential to legislating.'" *McSurely*, 553 F.2d at 1284–85 (footnotes omitted) (quoting *Doe*, 412 U.S. at 317, and *Gravel*, 408 U.S. at 621, 624–25). To qualify for Clause

protection, the act must be "directly related to the due functioning of the legislative process." *Rostenkowski*, 59 F.3d at 1302 (quotation marks omitted). This means that the Clause's protections apply only to a Members' legislative acts or activities that are "integral" to a Member's participation in "the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Gravel*, 408 U.S. at 625. As *Gravel* makes clear, if an action taken or communication made by a Member or their aide is "essential to the deliberations" of the House or Senate, and questioning the congressional actor would "threaten the integrity or independence" of Congress "by impermissibly exposing its deliberations to executive influence," then the action is a legislative act to which the privilege applies. *Id.* at 625–26. Conversely, the Clause's privilege does not apply where interference by the executive or judicial branches "does not draw in question the legislative acts of the defendant member of Congress or his motives for performing them." *Brewster*, 408 U.S. at 510 (quotation marks omitted); *Barker v. Conroy*, 921 F.3d 1118, 1127 (D.C. Cir. 2019) (quoting *Eastland*, 421 U.S. at 501, and *Brewster*, 408 U.S. at 517) ("Although the Supreme Court has instructed us to 'read the Speech or Debate Clause broadly to effectuate its purposes,' the Clause's 'shield does not extend beyond what is necessary to preserve the integrity of the legislative process[.]'").

Examples of "legislative activit[ies]" to which the privilege applies include "[c]ommittee reports, resolutions, and the act of voting[,]" *Gravel*, 408 U.S. at 617; introducing, voting for, and signing a budget ordinance, *Bogan v. Scott-Harris*, 523 U.S. 44, 55 (1998); subpoenaing records for a committee hearing, *Eastland*, 421 U.S. at 507; interrogating witnesses during committee hearings, *Tenney*, 341 U.S. at 377–78; "exchanges between a Member of Congress and the Member's staff or among Members of Congress on legislative matters[,]" *Rayburn*, 497 F.3d at

661; creating, administering and enforcing House (or Senate) rules concerning how Members can
cast their votes for legislation, *McCarthy*, 5. F.4th at 39; "enforcing [or executing] internal rules
of Congress[,]" *Consumers Union of U.S., Inc. v. Periodical Correspondents' Ass'n*, 515 F.2d
1341, 1350 (D.C. Cir. 1975); and other acts "generally done in a session of the House [or Senate]
by one of its members in relation to the business before it, or things said or done by [a Member],
as a representative, in the exercise of the functions of that office." *Brewster*, 408 U.S. at 512–13
(quotation marks and citation omitted).

"That [Members] generally perform certain acts in their official capacity as Senators does
not necessarily make all such acts legislative in nature." *Gravel*, 408 U.S. at 625.  Congressional
Members' (and staff's) activity that falls outside the core legislative activity shielded by the Clause
takes various forms and may be merely political or personal, insufficiently official or too loosely
tied to pending business before the Congress, or, more egregiously, illegal.  In short, the Clause
does not shield legislators from "inquiry into activities that are casually or incidentally related to
legislative affairs but not a part of the legislative process itself." *Brewster*, 408 U.S. at 528.
Distillation of relevant caselaw reveals at least three general categories of congressional Members'
activities not protected by the Clause.

First, the Clause does not protect conduct only tangentially related, but not necessary or
integral, to official legislative action.  This limit on the Clause is the hook on which the Supreme
Court has relied to clarify that the Clause does not immunize a sitting Member of Congress from
being prosecuted for "accepting a bribe in exchange for a promise relat[ed] to an official act," in
violation of 18 U.S.C. §§ 201(c)(1) & (g), *Brewster*, 408 U.S. at 502, because "[t]aking a bribe is
. . . no part of the legislative process or function" and is in no way "a legislative act," *id.* at 526.
Proof of such a criminal violation does not make it "necessary to inquire into how [the Member]

spoke, how he debated, how he voted, or anything he did in the chamber or in committee," but only that he had "tak[en] or agree[d] to take money for a promise to act in a certain way." *Id.* Consequently, the Speech or Debate Clause privilege does not apply. *See also Gravel*, 408 U.S. at 622 (noting that Clause does not protect "criminal conduct threatening the security of the person or property of others, whether performed [by a Member or] at the direction of [a] [Member] in preparation for or in execution of a legislative act"); *United States v. Renzi*, 651 F.3d 1012, 1020 (9th Cir. 2011) (explaining that if Member's "'negotiations' are not 'legislative acts,' then the Clause's protections would not shield them[,]" and the "Government could prosecute [him] for his allegedly corrupt conduct, and neither the testimonial nor evidentiary privileges would apply").

Second, though each legislative act inherently carries potential political consequences, general political activities are unprotected by the Clause. The Supreme Court has expressly put outside the Clause's shield "many activities" in which Members' engage, including "a wide range of legitimate 'errands' performed for constituents, the making of appointments with Government agencies, assistance in securing Government contracts, preparing so-called 'news letters' to constituents, news releases, and speeches delivered outside the Congress." *Brewster,* 408 U.S. at 512. Acknowledging that "[t]he range of these related activities has grown over the years," and that "[t]hey are performed in part because they have come to be expected by constituents, and because they are a means of developing continuing support for future elections[,]" the Supreme Court nonetheless deemed "these [] entirely legitimate activities" to be "political in nature rather than legislative," and therefore not within the scope of the Clause's protections. *Id.* Otherwise, any extension of the Clause to such political matters would "make Members of Congress super-citizens, immune from criminal responsibility." *Id.* at 516. The Clause was neither intended nor designed for such a broad scope.

The Supreme Court's distinction in *United States v. Brewster* between generally political and legislative acts provides an important check on the scope of the Clause's privilege. For example, in *Hutchinson v. Proxmire*, a Senator was sued for allegedly defamatory statements about the plaintiff contained in a newsletter sent to constituents and others. 443 U.S. at 114. The Court rejected the Senator's argument that newsletters and press releases were privileged in service of the "informing function" of Congress, *see id.* at 132, explaining that disseminating newsletters and press releases is not protected legislative activity since such dissemination is neither "'essential to the deliberations of the Senate' [or House] . . . [nor] part of the deliberative process," *id.* at 130. Other examples of unprotected non-legislative activities regularly engaged in by Members but not protected by the Clause include: "[p]romises by a Member to perform an act in the future[,]" *Helstoski*, 442 U.S. at 489; legislative prayer, *Barker*, 921 F.3d at 1127; communicating with Executive Branch officials, *Doe*, 412 U.S. at 313 (quoting *Gravel,* 408 U.S. at 625) ("Members of Congress may frequently be in touch with and seek to influence the Executive Branch of Government, but this conduct 'though generally done, is not protected legislative activity.'"); disseminating private documents to individuals or agencies outside of Congress, *see McSurely*, 553 F.2d at 1287 (footnotes and quotation marks omitted) ("Even though Members of Congress or their aides frequently intercede on behalf of constituents with agencies of the Executive Branch or disseminate to the public beyond the legitimate legislative needs of Congress documents introduced at committee hearings, such conduct falls outside of legislative immunity."); and a Member's testimony before a committee that is not inquiring into the exercise of the Member's official powers, *United States v. Rose*, 28 F.3d 181, 189 (1994) ("The testimony was not addressed to a pending bill or to any other legislative matter; it was, instead, the Congressman's defense of his handling of various personal financial transactions[,]" such that the Congressman "was acting

as a witness to facts relevant to a congressional investigation of his private conduct; he was not acting in a legislative capacity.").

Third, and of particular relevance here, a Member's informal investigative efforts or fact-finding inquiries untethered to a formally sanctioned congressional inquiry remain unprotected. To be sure, "[t]he power to investigate and to do so through compulsory process plainly falls within that definition" of the "legitimate legislative sphere" subject to the Clause. *Eastland*, 421 U.S. at 503–04; *see also id.* at 505 (alteration in original) (quoting *Doe*, 412 U.S. at 313) ("the act 'of authorizing an investigation pursuant to which . . . materials were gathered' is an integral part of the legislative process"). As the Supreme Court explained, "the power to investigate is inherent in the power to make laws because '[a] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change.'" *Id.* (alteration in original) (quoting *McGrain v. Daugherty*, 273 U.S. 135, 175 (1927)). Yet, the Clause is not a blanket shield for individual congressional Members (or staff) to undertake an investigation, even in their official capacity, of any matter that strikes their interest. *See Bastien v. Off. of Senator Ben Nighthorse Campbell*, 390 F.3d 1301, 1316 (10th Cir. 2004) ("No Supreme Court opinion indicates that Speech or Debate Clause immunity extends to informal information gathering by individual members of Congress. . . . To extend protection to informal information gathering—either personally by a member of Congress or by congressional aides—would be the equivalent of extending Speech or Debate Clause immunity to debates before local radio stations or Rotary Clubs.").

Assurance that the investigative step is fully and unambiguously authorized for a legislative purpose is critical. In *Eastland*, for example, the Supreme Court declined to bar enforcement of a congressional subpoena issued by a Senate Subcommittee that "was acting under an unambiguous

21

resolution from the Senate authorizing it to make a complete study of . . . a subject on which legislation could be had." 421 U.S. at 506 (quotation marks and citation omitted). Consistent with the Supreme Court's emphasis on the official congressional authorization of an investigative inquiry, the D.C. Circuit has likewise stressed that investigative efforts by congressional Members or staff to "obtain information" are protected by the Clause when those efforts are "performed in a procedurally regular manner." *Brown & Williamson*, 62 F.3d at 416.

Mindful of the Supreme Court's caution about "'finite limits' to the shield erected by the" Clause, *McSurely*, 553 F.2d at 1287 (quoting *Doe*, 412 U.S. at 317), the D.C. Circuit has bluntly stated that "a Member of Congress or congressional employee is not free to use every conceivable means to obtain investigatory materials, without fear of criminal prosecution or civil suit[,]" *id.* For the privilege to apply to "field investigations by a Senator or his staff[,]" two conditions must be met: (1) the inquiry must have been congressionally authorized; and (2) no "unlawful means" were used to achieve a proper legislative objective because such means "is simply not essential to legislating." *Id.* at 1286–88. In *McSurely v. McClellan*, an investigator for a congressional subcommittee unlawfully seized and made photocopies of 234 of plaintiffs' documents, including certain documents with no legislative purpose or relevancy. Even though the Subcommittee was authorized to investigate the types of criminal activities in which the plaintiffs were allegedly involved, the Clause did not protect the investigator's—and by extension, the Subcommittee's— unconstitutional seizure of the documents at issue. *Id.* at 1296 ("[T]he immunity shield . . . is not a license to invade privacy where no legislative purpose can be plausibly interposed."). Thus, the D.C. Circuit concluded that the Subcommittee's seizure, through an investigator, of the 234 documents at issue was not protected by the Speech or Debate Clause. *Id.*[7]

---

[7]     At the same time, in careful parsing of the facts, the D.C. Circuit found that official actions taken collectively by Subcommittee Members subsequent to the illegal retrieval of the letters were protected by the Clause, including

The D.C. Circuit has expanded the scope of the Speech or Debate Clause beyond the Supreme Court's articulated limits by creating a broad non-disclosure privilege for congressional Members' legislative records, even when only non-legislative records are sought through a search warrant or a subpoena in a criminal investigation. *Rayburn*, 497 F.3d at 656 ("[T]he compelled disclosure of privileged material to the Executive during execution of the search warrant . . . violated the Speech or Debate Clause[.]"); *see also Brown & Williamson*, 62 F.3d at 420 (holding that the Clause prevents the disclosure of legislative documents to third-parties).[8]  In *Rayburn*, the Court held that the Executive could not review paper or electronic records seized in the Congressman's office, pursuant to a search warrant for non-legislative materials, because the search of such files in the legislator's office "must have resulted in the disclosure of legislative

---

the Subcommittee's use the 234 photocopies "as the basis for issuance of subpoenas for some of the documents, and the procurement of contempt of Congress citations against plaintiffs" for failing to respond to the subpoenas, and thus the Clause barred the plaintiffs from questioning Subcommittee Members on the issue of damages for the issuance of subpoenas to obtain the records. *McSurely*, 553 F.2d at 1296–97.  The Court reasoned that, under binding precedent, when "material comes to a legislative committee by means that are unlawful or otherwise subject to judicial inquiry[,] the subsequent use of the documents by the committee staff in the course of official business is privileged legislative activity."  *Id.*  Similarly, the plaintiffs' claim against the Members for "invasion of privacy based on retention and display of their private papers within the Subcommittee for non-legislative purposes" was barred by the Clause because, "[a]lthough the federal defendants [were] not immune from inquiry as to dissemination of the 234 photocopies to individuals or agencies outside of Congress, dissemination within the Subcommittee is privileged activity."  *Id.* at 1297.  In short, because the Subcommittee "employed proper process for information 'on which legislation could be had,'" *id.* at 1298 (quoting *Eastland*, 421 U.S. at 504–07 & n. 15), and the officially issued "subpoenas called for materials that were at least arguably relevant to its investigation," the Clause protected against claims involving, or questioning regarding, that legislative conduct, *id.*

[8]    *Brown & Williamson Tobacco Corp.* marked the first time the D.C. Circuit held that the Clause equips Members (and staff) with a non-disclosure privilege for legislative documents.  62 F.3d at 420 ("We do not accept the proposition that the testimonial immunity of the Speech or Debate Clause only applies when Members or their aides are personally questioned.  Documentary evidence can certainly be as revealing as oral communications . . . and this is true whether or not the documents are sought for the purpose of inquiring into (or frustrating) legislative conduct or to advance some other goals[.]").  Prior to *Brown & Williamson* (and *Rayburn*), the D.C. Circuit had stated that "the Speech or Debate Clause acts as an exclusionary rule and testimonial privilege, as well as substantive defense," requiring that "plaintiffs must prove their case through evidence which 'does not draw in question the legislative acts of the defendant member of Congress [and his aides] or [their] motives for performing them,'" *McSurely*, 553 F.2d at 1299 (quoting *Brewster*, 408 U.S. at 526, and *Johnson*, 383 U.S. at 185).  Such an exclusionary and testimonial privilege is more limited than the current binding precedent, in this Circuit only, that the Clause operates as a non-disclosure privilege, thereby triggering the time-consuming and resource-intensive task of *in camera* review to resolve disputes about the applicability of the Clause.

materials to agents of the Executive[,]" and it thereby violated the legislator's rights under the Clause. 497 F.3d at 661.[9] In the Court's view, "[t]he special procedures outlined in the warrant affidavit would not have avoided the violation of the Speech or Debate Clause because they denied the Congressman any opportunity to identify and assert the privilege with respect to legislative materials before their compelled disclosure to Executive agents." *Id.* at 662; *see also id.* at 661 (quotation marks omitted) (explaining that "incidental review . . . does not deny that compelled review by the Executive occurred, nor that it occurred in a location where legislative materials were inevitably to be found, nor that some impairment of legislative deliberations occurred").

*Rayburn* stands alone in its conclusion that the Clause affords congressional Members a non-disclosure privilege. [10] The Third and Ninth Circuits are the only other circuits to consider

---

[9]  *Rayburn* concluded that the investigative agents' imaging and keyword search for responsive non-legislative records on the congressman's hard drives and electronic media was constitutionally permissible only "given the Department of Justice's voluntary freeze of its review of the seized materials and the procedures mandated on remand by this court[,]" 497 F.3d at 655, referring to the Remand Order, *see supra* n.5, since those circumstances meant that "the imaging and keyword search of the Congressman's computer hard drives and electronic media exposed no legislative material to the Executive, and therefore did not violate the Speech or Debate Clause," 497 F.3d at 655. In other words, for both paper and electronic records seized from his House office, the congressman was entitled to review the records for potential Clause privilege prior to disclosure to law enforcement agents from the Executive branch. Notably, the congressman involved in *Rayburn* claimed legislative privilege only over paper and electronic records seized in his congressional office and did not object on Clause privilege grounds to the search of documents seized elsewhere during the course of the subsequent criminal investigation into his activities. *See generally, United States v. Jefferson,* Case No. 1:07-cr-00209 (E.D. Va.).

[10]  In a concurring opinion in *Rayburn,* Judge Henderson leveled two criticisms at the majority's analysis: First, *Brown & Williamson* "relied heavily on the Clause's purpose—shielding the legislative process from disruption—in reading the Clause's prohibition of 'question[ing]' broadly to protect the 'confidentiality' of records from the reach of a civil subpoena," and, in comparison, enforcement of the criminal search warrant would be much less distracting because the warrant would be executed to reduce disruption "by, *inter alia,* executing the warrant when the Congress was not meeting, imaging computer hard drives rather than searching the computers, using specific search terms for both paper and electronic records and, most importantly, creating Filter Teams . . . and ensuring subsequent in camera judicial review to minimize exposure to privileged records," *Rayburn,* 497 F.3d at 669–70 (Henderson, J., concurring) (citation omitted); and, second, apart from deviating from the Clause's principal purposes, *Rayburn* could "jeopardize law enforcement tools that have never been considered problematic[,]" leading to a parade of horribles, with Members and their staff being able to delay or circumvent effective criminal prosecution, *id.* at 671–72 (quotation marks omitted) (observing that, if mere "Executive Branch exposure to records of legislative acts" is prohibited by the Clause, a Member would always have to be given advanced notice of any search of her house or property, FBI agents would not be able to voluntarily interview Members and staff, and the ability for the government to effectively prosecute Members for criminal activity would be severely hampered).

the issue and both concluded that the Clause does not create a non-disclosure privilege when applied to records or third-party testimony, but rather operates as a "nonevidentiary use" privilege. *See In re Grand Jury Investigation*, 587 F.2d 589, 597 (3d Cir. 1978) ("But to the extent that the Speech or Debate Clause creates a Testimonial privilege as well as a Use immunity, it does so only for the purpose of protecting the legislator and those intimately associated with him in the legislative process from the harassment of hostile questioning. It is not designed to encourage confidences by maintaining secrecy, for the legislative process in a democracy has only a limited toleration for secrecy."); *Renzi*, 651 F.3d at 1032 (rejecting the contention "that there exists some grandiose, yet apparently shy, privilege of non-disclosure that the Supreme Court has not thought fit to recognize"); *see also id.* at 1034 ("Simply stated, we cannot agree with our esteemed colleagues on the D.C. Circuit. We disagree with both *Rayburn*'s premise and its effect and thus decline to adopt its rationale.").[11] No matter the critiques, however, *Rayburn* is binding on this Court.

Set against these legal principles, the disputed records are next considered.

### B.   Review of Disputed Responsive Records on Rep. Perry's Personal Cell Phone

In accordance with the protocol outlined in the warrant's Attachment C, Rep. Perry has withheld from production to the government 2,219 responsive records from his cell phone that he

---

[11]     *Rayburn* (and the D.C. Circuit's decision in *Brown & Williamson* twelve years earlier) have also been criticized for overextending the Clause's protections beyond its founding purposes. *See, e.g.,* Michael L. Shenkman, *Talking About Speech or Debate: Revisiting Legislative Immunity*, 32 YALE L. & POL. REV. 351, 417 (2014) (explaining that the D.C. Circuit took the Clause's "protection too far by transforming 'written legislative materials' into an impermeable physical bunker of non-disclosure" and creating "an area unmoored from history or Supreme Court precedent"); Jay Rothrock, *Striking A Balance: The Speech or Debate Clause's Testimonial Privilege and Policing Government Corruption*, 24 TOURO L. REV. 739, 756–57 (2008) (footnotes omitted) ("While the Supreme Court has traditionally narrowed the scope of Speech or Debate Clause privileges by refining the definition of 'legislative acts,' the *Brown & Williamson* Court implicitly expanded the scope of the clause by broadening 'questioning' to include responding to a civil subpoena[,] . . . plac[ing] too great a control over the privilege in legislators' own hands without providing for an explicit, effective procedure for judicial review. Over a decade later, . . . [in *Rayburn*], the [C]ourt would repeat this same mistake, expanding the scope of the clause through the definition of 'questioning,' and thus giving investigated legislators an unjustified increase in control over information in a criminal case.")

believes are privileged under the Clause, and—over three months after issuance of the D.D.C

Warrant—has submitted those records to the Court for *in camera* review to complete execution of

that warrant by disclosure to the government of any non-privileged, responsive records.   These

records are in the form of email and text communications, with some attachments.   Broadly

speaking, Perry asserts privilege as to these withheld records on the basis that they were part of his

"information gathering" efforts in preparation for his legislative role and vote on the certification

of the 2020 presidential election on January 6, 2021, pursuant to the Electoral Count Act of 1887

("ECA"), 24 Stat. 373, 3 U.S.C. §§ 5, 6, and 15, or otherwise "to ensure the integrity of our

elections going forward."   Perry Mot. at 6, 10.

   The government rightly raises no dispute that activities integral to Rep. Perry's ECA vote

are protected under the Clause.   *See generally* Gov't's Mem.   Certainly, the law is well-settled that

"legislative acts for purposes of Speech-or-Debate-Clause immunity include both (i) matters

pertaining 'to the consideration and passage or rejection of proposed legislation,' and (ii) 'other

matters which the Constitution places within the jurisdiction of either House.'"   *McCarthy*, 5 F.4th

at 40 (quoting *Gravel*, 408 U.S. at 625).   Congress's role in certifying the results of the Electoral

College vote is constitutionally and statutorily mandated.   *See* U.S. CONST. amend. XII ("The

President of the Senate shall, in the presence of the Senate and House of Representatives, open all

the certificates and the votes shall then be counted;—the person having the greatest number of

votes for President, shall be the President, if such number be a majority of the whole number of

Electors appointed[.]"); 3 U.S.C. § 15 (describing the process by which Members of Congress

shall count and certify the electoral votes from each state). Given that certification of the Electoral

College vote is a matter which the Constitution places within the jurisdiction of both Houses of

Congress, activities necessary and integral to fulfilling that task are entitled to Clause protection.

Rep. Perry's communications with fellow congressional Members and staff directly relating to internal House of Representatives committee assignments or membership, pending legislation or floor votes on such legislative matters, as well as voting and/or speaking order and strategy for the ECA vote on January 6, 2021, are protected under the Clause. Such communications are integral to Rep. Perry's consideration and carrying out of his official role in the legislative and presidential certification processes.

Yet, just as "everything a Member of Congress may regularly do is not a legislative act within the protection of the Speech or Debate Clause" and "legislative acts are not all-encompassing," *Doe*, 412 U.S. at 313 (quotation marks and alteration omitted), not all activity undertaken, even in an official capacity, is shielded by the Clause—a principle that extends to



As explained below, examination of the withheld responsive records demonstrates that only 164 of the 2,219 responsive records at issue fall, in whole or part, under the Clause's protection.

Rep. Perry asserts Speech or Debate Clause protection for 678 of his responsive records containing communications with ███████████████████████ and "Other" individuals, based only on the argument that he was engaging in "fact-finding" efforts "to gather information about the security of the 2020 election and the validity of the electors required to certify the election." Perry Mot. at 7–8. He offers no other substantive argument for his privilege assertion as to these responsive records and thus these records are discussed together.[12]

As a threshold matter, general descriptions of each of these four categories demonstrates how far afield these communications are from formal legislative activities. First, Rep. Perry communicated with so-called privat



Second, his

---

[12] These responsive records were designated by Rep. Perry as falling into subcategories A (201 records), D (86 records), E (128 records), F (68 records), G (1 record), J (101 records), K (11 records), L (32 records), and O (50 records). *See, supra*, in Part I.C.

communications with ████████████████████████████████████

██████████ show that Rep. Perry received from and relayed to these officials information about
████████████████████████████████████████████████████████

██████████████████████████████████ Third, Rep. Perry's

communications with variou ███████████████████████████████

███████████████████████████████████████████████████████████

██████ Fourth, the category of "Other" responsive records span an array of private individuals



and cover a grab-bag of topic

 

In the broadest possible terms, Rep. Perry believes the Clause shields all these responsive records from investigative review because they are part of his informal fact-finding efforts to understand election security issues in the 2020 election since the ECA process "obligated Rep. Perry to vote on whether to confirm the electors and certify the 2020 election" and to determine "whether there were enough unlawful votes to question the outcome of the election." Perry Mot. at 9–10. The Court is no position to assess the sources of information Rep. Perry chose to use, the significance of that information to him in how he chose to act, or whether the information he obtained or relayed amounted to verifiable facts. Such an assessment is both unnecessary and irrelevant to the pending legal issue. What is plain is that the Clause does not shield Rep. Perry's random musings with private individuals touting an expertise in cybersecurity or political discussions with attorneys from a presidential campaign, or with state legislators concerning hearings before *them* about possible local election fraud or actions *they* could take to challenge



election results in Pennsylvania, because those communications are just "casually or incidentally related to legislative affairs but not a part of the legislative process itself," *Brewster*, 408 U.S. at 528, including the ECA process.

As the following examples reveal, the scattershot nature of Rep. Perry's communications with these private individual

demonstrates that their overarching catch-as-catch-can purpose was t



Absent firm ties to a regular and formal legislative process before the Congress, the content

of these communications makes apparent that this conduct was merely "casually or incidentally

related to legislative affairs," *Brewster*, 408 U.S. at 528, such that the Clause does not apply. As

the D.C. Circuit has explained, just because conduct is engaged in to "perform or aid in the

performance of legislative acts," does not cloak that conduct with privilege; instead, the Clause

"encompasses the execution of legislation when the executing actions themselves constitute

legislative acts." *McCarthy v. Pelosi*, 5 F.4th at 41 (quotation marks omitted).   These
communications with private individuals and with State legislators do not themselves qualify as
legislative acts.

Rep. Perry's communications relaying or seeking information were not congressionally
authorized "by [a] particular subcommittee[,]" *McSurely*, 553 F.2d at 1287, let alone initiated or
received "in a procedurally regular fashion[,]" *see Brown & Williamson*, 62 F.3d at 416, so his
fact-finding efforts are untethered from any formal legislative activity.   Disclosing these
responsive records to the government thus would not "threaten the integrity or independence" of
Congress because their disclosure would not risk "impermissibly exposing its deliberations to
executive influence." *Gravel*, 408 U.S. at 625.   Nor were these communications part of, let alone
integral to, any legislative process or the ECA process within the House of Representatives or Joint
Session of Congress mandated by the U.S. Constitution and the ECA.   No matter the vigor with
which Rep. Perry pursued his wide-ranging interest in bolstering his belief that the results of the
2020 election were somehow incorrect—even in the face of his own reelection—his informal
inquiries into the legitimacy of those election results are closer to the activities described as purely
personal or political in *Brewster* since this "fact-finding" was conducted entirely outside the
auspices of a formal congressional inquiry or authorization. *See* 408 U.S. at 512–13.

Indeed, the lack of formality surrounding these communications evinces that he initiated
them fo ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮   Revelation of these communications to the investigative authorities would thus merely
disclose communications that were, at most, just incidentally related to his ECA vote, so the Clause
does not apply to them. *See Fields v. Office of Eddie Bernice Johnson*, 459 F.3d 1, 10 (D.C. Cir.
2006) (cleaned up) (emphasis in original) ("The Speech or Debate Clause does not prohibit inquiry

into illegal conduct simply because it has some *nexus* to legislative functions, or because it is merely related to, as opposed to part of, the due functioning of the legislative process."). Accordingly, these responsive records are not entitled to Clause protection.

Rep. Perry makes two other arguments about why his fact-finding efforts are protected under the Clause, neither of which withstand scrutiny. First, Rep. Perry urges that his motives for initiating these fact-finding inquiries cannot be questioned because "there is an objectively legislative purpose for his actions." Perry Suppl. (*ex parte*) at 23. For this argument, Rep. Perry relies on *Bogan v. Scott-Harris*, where the Supreme Court concluded that legislative immunity barred a First Amendment retaliation claim against local officials for eliminating the plaintiff's position, allegedly as a result of her filing a complaint against an employee working under her supervision. 523 U.S. at 46–47, 55. His reliance on *Bogan* is misplaced since that case only highlights the fundamental flaw in Rep. Perry's assertion of legislative privilege for his "fact-finding" activities: the utter lack of procedural regularity in his sprawling efforts. To be sure, in *Bogan*, the Supreme Court confirmed well-settled law that the standard for determining whether an act is legislative "turns on the nature of the act itself, rather than on the" legislators' "motive or intent." 523 U.S. at 54; *see also Rangel*, 785 F.3d at 24 ("[A] charge . . . that the Congressman's conduct was improperly motivated . . . is precisely what the Speech or Debate Clause generally forecloses from . . . judicial inquiry.") (quotation marks omitted and alterations in original). At the same time, even after "stripp[ing] [] all considerations of intent and motive," the *Bogan* Court had "little trouble concluding that" the challenged local city council vice president and city mayor's actions were "quintessentially legislative" because they involved "voting for an ordinance," "introduction of a budget[,] and signing into law an ordinance," all of which activities "were formally legislative . . . because they were integral steps in the legislative process[.]" 523

34

U.S. at 55. Thus, the local legislators' were entitled to absolute legislative immunity from civil liability. *Id.* In stark contrast, Rep. Perry's communications with private, non-federal government individuals across these 678 responsive records possess none of the "hallmarks of traditional" legislative activity—they were simply informal communications he engaged in for his own informational and political purposes. In short, no matter his motives for initiating or engaging in those communications, under *Bogan*, they were neither necessary nor integral any formal legislative or ECA procedure.

Relatedly, Rep. Perry defends his "fact-finding" efforts, saying that he "acted on information provided by sources that he considered to be credible" when soliciting and relaying information from individuals in these 678 responsive records and that "his actions must be considered in the context of the moment, rather than in perfect hindsight." Perry Suppl. (*ex parte*) at 4. Just as Rep. Perry's own motives and intent are irrelevant to the determination of whether the Clause applies, however, so too is the "credibility" of the individuals with whom he spoke, since the "[t]he key consideration . . . is the act presented for examination, not the actor." *Walker*, 733 F.2d at 929. Here, Rep. Perry's assertion that the purpose for his communications with private individuals, includin ███████████████████████████████████████████ ███████████████████ vote shows only a tangential nexus between those communications and any official action he took as a legislator in challenging elector certifications or casting a vote. Certainly, his actual use of the information he may have gained from these communications during any formal debate in either the Joint Session of Congress or separate House debate during the ECA process on the House floor is entitled to Clause protection. His individual and informal pursuit, gathering, and culling of information reflected in the 678 responsive records to inform his actions

on the House floor—without formal sanction by any regular procedure in the House—is, however, not privileged. *See McSurely*, 553 F.2d at 1287.

  Second, Rep. Perry urges that his "actions here are not unlike those taken by Senator Lindsey Graham" in the wake of the 2020 election and are similarly protected by the Clause for the same reasons that Sen. Graham's fact-finding efforts are protected. Perry Mot. at 7.  Sen. Graham was indeed partially successful in quashing a subpoena issued by a special grand jury in the State of Georgia for testimony about conversations he had with the Georgia Secretary of State about instances of voter fraud in the 2020 election in that state. *See In re Graham*, No. 1:22-CV-03027-LMM, 2022 WL 13692834, at *8 (N.D. Ga. Sept. 1, 2022).  In that case, the district court concluded that "Senator Graham may not be questioned about investigatory fact-finding that allegedly took place on the phone calls with Georgia election officials because such fact-finding constitutes protected legislative activity[,] . . . mean[ing] that Senator Graham [could not] be questioned as to any information-gathering questions he posed (or why he posed them) about Georgia's then-existing election procedures or allegations of voter fraud." *Id.* at *8.[17]  In reaching this conclusion, the court surveyed binding caselaw from the Supreme Court, most particularly in *Bogan* and *Eastland,* on the scope of the Clause's protections, and it observed that the test for

---

[17]  On appeal, neither the Eleventh Circuit nor the Supreme Court opined on the merits of this conclusion and certainly did not adopt it; instead, both Courts merely pointed to the breadth of protection afforded to Senator Graham's communications under the district court's reading of the Clause and denied his requests for a stay of his required grand jury testimony since he could not establish that he was likely to succeed on his remaining claims of privilege. *See Fulton Cnty. Special Purpose Grand Jury v. Graham*, No. 22-12696-DD, 2022 WL 13682659, at *2 (11th Cir. Oct. 20, 2022) ("Senator Graham has failed to demonstrate that this approach will violate his rights under the Speech and Debate Clause. . . . [He] can [be] ask[ed] about non-investigatory conduct that falls within the subpoena's scope, but . . . [s]hould there be a dispute over whether a given question about Senator Graham's phone calls asks about investigatory conduct, the Senator may raise those issues at that time [with the district court]. . . . We thus find it unlikely that questions about them would violate the Speech and Debate Clause."); *Graham v. Fulton Cnty. Special Purpose Grand Jury*, 143 S. Ct. 397, 398 (2022) (denying Sen. Graham's stay and injunction pending appeal because "a stay or injunction is not necessary to safeguard the Senator's Speech or Debate Clause immunity" since the "[t]he lower courts assumed that the informal investigative fact-finding that Senator Graham assertedly engaged in constitutes legislative activity protected by the Speech or Debate Clause").

determining whether an activity is legislative "does not necessarily include a formality requirement and, as presently fashioned, it allows for flexibility of analysis depending on the circumstances of a given case." *Id.* at *3. This conclusion relies on a troublesome reading of Supreme Court precedent and, in any event, runs contrary to binding caselaw in the D.C. Circuit, so it is unpersuasive.

Unlike the Eleventh Circuit, the D.C. Circuit has expressly found that a Member's informal fact-finding efforts must be formally authorized by a Congressional body to constitute protected legislative activity. *McSurely*, 553 F.2d at 1287. In establishing this requirement, the *McSurely* Court relied heavily on the Supreme Court's "recent decision in *Eastland v. United States Servicemen's Fund*," decided just one year before. *Id.* at 1286. In *Eastland*, the Supreme Court reasoned that a Subcommittee's enforcement of a subpoena was protected legislative activity because the Subcommittee "was acting under an unambiguous resolution from the Senate[,]" so its inquiry could "fairly be deemed within [the Subcommittee's] province." 421 U.S. at 505–06 (quotation marks omitted) (alteration in original). Likewise, over twenty years later in *Bogan*, the Supreme Court found the Clause privilege applied to actions that were "quintessentially legislative[,]" involving "voting for an ordinance[,]" "introduction of a budget[,] and signing into law an ordinance." *Bogan*, 523 U.S. at 55. The *McSurely* Court accordingly reasoned that, though the Clause privilege "extend[s] to field investigations by a Senator or his staff" to ensure "enough threshold information to know where" to target subpoenas and to acquire "knowledge through informal sources" necessary "to discharge their constitutional duties properly," *id.* at 1286–87, an investigative endeavor qualifies for Clause protection only when the "requirement of congressional authorization of the inquiry by the particular subcommittee involved" is met, *id.* at 1287. None of Rep. Perry informal "fact-finding" efforts were sanctioned in any way by formal House or

committee authorization or otherwise part of the regular procedural process integral to the

Electoral College vote certification process, under the Constitution or ECA.  Rather, Rep. Perry's

informal "fact-finding" activities involvin ███████████████████████████████████

███████████████████ was pursued by him as an individual Member.  *McSurely* forecloses his claims

of privilege.

Even were Rep. Perry's argument not foreclosed by binding precedent in this Circuit, his

theory of privilege—giving Clause protection to a Member's informal fact-finding efforts

untethered from a formal legislative inquiry—would be "both unwise in principle and unworkable

in practice."  *See In re Grand Jury Subpoenas*, 571 F.3d at 1207 (Kavanaugh, J., concurring).  This

caution is amply demonstrated by the painstaking parsing the district court directed *In re Graham*

as to the types of questions that Sen. Graham could or could not be asked to testify about

concerning his communications with the Georgia Secretary of State, when "the very nature and

substance of these calls has been a source of public debate and dispute among the calls'

participants."  2022 WL 13692834, at *4; *id.* (noting that "there is a fundamental factual dispute

as to the very nature and substance of the phone calls and what Senator Graham *actually stated

and suggested* on the calls") (emphasis in original); *id.* at *4, *8 (instructing that "asking broad

questions of intent that could implicate some legitimate legislative activity (such as asking Senator

Graham why he made the calls to Georgia election officials)" were barred under the Clause, as

were "question[s] about investigatory fact-finding that allegedly took place on the phone calls with

Georgia election officials," but "to the extent [Sen. Graham] asked questions or made statements

that went beyond mere inquiries into Georgia's then-existing procedures (that is, to the extent

Senator Graham suggested that Georgia election officials take certain actions or alter their

procedures), those statements and questions may be the subject of inquiry before the grand jury

because they are not protected legislative activity"); *id.* at *4 ("Again, it is possible that the phone calls contained both legislative and non-legislative activity, and the Speech or Debate Clause protects only that which is legislative."). The nuanced line-drawing articulated by the district court in the case of Senator Graham to distinguish appropriate from privileged inquiry of a Member of Congress called to testify before the grand jury about his informal fact-finding efforts is even more challenging when conducting an *in camera* document review because the full context of any given communication may not be discernible. This approach of affording Clause protection to such informal fact-finding efforts would assuredly "create considerable confusion" as to whether the Clause applies and invite inconsistent applications of the legislative privilege. *Cf. In re Grand Jury Subpoenas*, 571 F.3d at 1207 (Kavanaugh, J., concurring). *McSurely* intentionally avoided this parsing quagmire because the requirement of formal legislative authorization connects a Member's informal investigative activities to a sanctioned legislative purpose, making clear whether the Clause applies or not.

For these reasons, all 678 responsive records in the four categories o███████████████████ ███████████████████████████████████████████████████████████ and "Other" individuals are not protected under the Clause and must be disclosed to the government.

### 2. Communications With Congressional Members and Staff

Rep. Perry's 611 responsive records in Subcategory B—which contains communications exclusively with congressional Members and staff, *see, supra*, Part I.C.—run the gamut of topics, from matters related to the internal HFC elections to the ECA vote.[18] While these communications

are lumped by Rep. Perry into a single category, *see* Perry Mot. at 4–5, *in camera* review reveals that these responsive records may be grouped as follows: (a) communications with Members and staff about legislation and votes; (b) communications with Members and staff concerning committee assignments and HFC Board elections; (c) electronic newsletters from House Republican Conference leadership; (d) communications with staff concerning Rep. Perry's own press coverage or media strategy; and (e) communications with Members concerning suspected election fraud in, and legal challenges to, the results of the 2020 presidential election.

The Clause protects Rep. Perry's communications with legislative staff and other Members, so long as those records are "an integral part of the deliberative and communicative processes" of lawmaking. *Gravel*, 408 U.S. at 625; *see also Rayburn*, 497 F.3d at 661 (explaining that "exchanges between a Member of Congress and the Member's staff or among Members of Congress on legislative matters" are protected by the Clause). Put another way, just because Rep. Perry is communicating with other Members and/or staff does not automatically trigger the Clause's protections. Consequently, the Clause protects only the first two groups of responsive records and one type of electronic newsletter in the third group in this category.

*(a) Communications With Members And Staff About Legislation And Votes*



Given that the Clause unequivocally protects "against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts[,]"*Helstoski*, 442 U.S. at 489 (quotation marks omitted), and the "act of voting" itself, *Gravel*, 408 U.S. at 617, these communications with Members and staff that are integral to or part of a Member's decision to cast a vote in favor or against and procedures on the House floor, including communications about how and when a Member should speak, are privileged.

### (b) Communications With Members And Staff Concerning Committee Assignments And HFC Board Elections

Although not directly touching on pending legislation or related votes or procedural matters, the second group of responsive records involving communications between or among Members or staff about preferred committee assignments and votes for board membership in the HFC, are also protected by the Clause.



The same principles apply to Members' internal deliberations about the board election for the HFC, even though this entity is not a formal House standing committee or subcommittee, since the HFC is a recognized caucus organized by House Members to promote and effect the legislative agenda. Accordingly, internal deliberations about HFC board elections fall within "the regular course of the legislative process[.]" *Helstoski*, 442 U.S. at 489 (quotation marks omitted).

### *(c) Electronic Newsletters From House Republican Conference Leadership*

Rep. Perry received from the House Republican Conference a significant volume of electronic newsletters delivered via email

These responsive records are not privileged for at least two reasons. First, the scheduled date and time for meetings or other events reveals only that meetings occurred or were anticipated to occur, without disclosing much, if anything, about the subject matter of what actually occurred

at the meetings, so they reveal nothing about internal deliberations related to legislative matters. *Cf. Brewster*, 408 U.S. at 502 (holding that if it is not "necessary to inquire into how [the Member] spoke, how he debated, how he voted, or anything he did in the chamber or in committee," the act or activity is not privileged).

Second, internal newsletters discussing upcoming events, political talking points, news articles of interest, and events occurring in and around Congress are not protected because they are purely political and not integral to any formal legislative activity. In *Hutchinson*, the Supreme Court made clear that just because written materials are issued by congressional Members or staff does not qualify those materials automatically as privileged. 443 U.S. at 130. By contrast to a speech delivered by a Member on the Senate or House floor that would be protected under the Clause, newsletters and press releases are neither "essential to the deliberations of the Senate" nor "part of the deliberative process." *Id.* (explaining that just as a Member "may not with impunity publish a libel from the speaker's stand in his home district," republishing a libelous statement outside of a formal committee report or floor statement "is not an essential part of the legislative process and is not part of that deliberative process 'by which Members participate in committee and House proceedings'" (quoting *Gravel*, 408 U.S. at 625)). Although the electronic newsletters at issue here appear to be internal to House Republican Members—unlike the written materials at issue in *Hutchinson* that were intended for dissemination outside the Congress—the non-legislative matters covered in the contents of the instant electronic newsletters defeat any privilege claim

43



*(d) Communications With Staff Concerning Rep. Perry's Own Press Coverage Or Media Strategy*

Responsive records consisting of communications regarding Rep. Perry's own press coverage or media strategy are not protected by the Clause because these activities are plainly political under *Brewster* and *Hutchinson*



Here, the acts in question are political communications, not legislative.

**(e)  Communications With Members Concerning Election Fraud In The 2020 Election And Legal Challenges To Results Of That Election**

Rep. Perry's communications with Members and staff about alleged election fraud and security concerns in the 2020 election as well as legal efforts to challenge the results of that election are not privileged because they are purely political rather than legislative in characte



These responsive records are textbook political conversations not protected by the Clause. As already noted, merely because these responsive records reflect communications with other Members does not automatically qualify them for protection under the Clause. Most significantly, these communications are not integral to activities "generally done in a session of the House [or Senate] by one of its members in relation to the business before it." *Brewster*, 408 U.S. at 510 (quotation marks omitted)

challenge that result.  At best, these communications were merely incidental to Rep. Perry's ECA

vote, and as such are "beyond the legitimate legislative needs of Congress" and "fall[] outside of

legislative immunity."  *McSurely*, 553 F.2d at 1285–86 (quotation marks omitted).[19]

In sum, 164 of Rep. Perry's 611 communications with other Members and staff contain

privileged information.[20]  Specifically, only Rep. Perry's responsive records with Members and

staff that directly concern legislative activities— *i.e.*, his conversations with Members and/or staff

about votes, strategy in preparation for votes, committee assignments, and HFC Board elections,

and internal, electronic newsletters he received discussing votes or legislation—are privileged

under the Clause because they involve communications integral to the legislative process.  The

remainder of his communications with Members and/or staff—*i.e.*, his conversations about press

coverage and political messaging, his communications about fraud and security concerns in the

2020 election, and general newsletters he received from House GOP leadership—are political in



nature rather an integral part of the legislative process, so they must be disclosed to the government.

### 3. Communications With Executive Branch Officials

Rep. Perry's final category of responsive records consists of 930 responsive records containing communications with Executive Branch officials that focus principally on ▮

▮ Conceding "the fact that Rep. Perry was communicating with executive branch officials . . . is not determinative of the applicability of the Speech or Debate Clause," Perry Mot. at 10–11, Rep. Perry nonetheless asserts these communications are protected because, like his communications with private individual ▮

▮ he engaged in these communications "for the purpose of obtaining information that might further Rep. Perry's legislative responsibilities and purpose[,]" *id.* at 11.[22]



Rep. Perry is wrong.  None of these communications are protected by the Clause.  First and foremost, the entire premise of Rep. Perry's claim for privilege over these communications would turn the Clause's foundational purpose on its head.  That purpose is straight-forward and simple: to "preserve the constitutional structure of separate, coequal, and independent branches of government . . . [by preventing] intrusion by the Executive and the Judiciary into the sphere of protected legislative activities." *Helstoski*, 442 U.S. at 491; *see also id.* (quotation marks omitted) ("[T]he privilege was [] born primarily of a desire . . . to prevent intimidation by the executive and accountability before a possibly hostile judiciary.").  Rep. Perry's communications with Executive Branch officials, as reflected in the responsive records, demonstrate that he welcomed, rather than resisted, and indeed often initiated these communication ███████████████████████████

████████ His efforts to engage with Executive Branch official ██████████████████

████████ were proactive, persistent, and protracted.  Given the Clause's purpose to protect congressional Members from untoward interference from the Executive Branch with legislative matters, Rep. Perry's reliance on the Clause to shield his multi-pronged push for Executive Branch officials to take more aggressive action is not only ironic but also must fail as beyond the scope of the Clause.

The Supreme Court recognized this significant limit on the Clause's scope in *Gravel*, observing that "Members of Congress are constantly in touch with the Executive Branch of the

Government and with administrative agencies—they may cajole, and exhort with respect to the administration of a federal statute—but such conduct, though generally done, is not protected legislative activity." 408 U.S. at 625



Set against the backdrop of the Supreme Court's firm statement in *Gravel* that a

Member's communications with the Executive Branch are political and not legislative, Rep. Perry's communications with these officials are plainly not protected by the Clause.

For the above reasons, Rep. Perry's assertion of privilege over his 930 communications with Executive Branch officials cannot be sustained and these responsive records must be disclosed to the government.

## III.   CONCLUSION

For the reasons stated above, Rep. Perry's Motion, ECF No. 21, is **GRANTED IN PART AND DENIED IN PART**.  Accordingly, Rep. Perry must disclose to the government the vast majority of the 2,219 responsive records, with attachments, from Rep. Perry's cell phone submitted for review to the Court, with only 164 records requiring redaction or withholding on the basis of privilege under the Speech or Debate Clause.

Date: December 28, 2022

*Beryl A. Howell*

BERYL A. HOWELL
Chief Judge

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE FORENSIC COPY OF THE CELL PHONE OF REPRESENTATIVE SCOTT PERRY | Case No. 22-sc-2144 (BAH)<br><br>Chief Judge Beryl A. Howell<br><br>**UNDER SEAL** |

## MEMORANDUM OPINION AND ORDER

Representative Scott Perry ("Rep. Perry") seeks to stay the disclosure of 2,055 records on his personal cell phone to the government, pending his appeal of this Court's Order and Memorandum Opinion, both issued on December 28, 2022 ("Dec. 2022 Order" and "Dec. 2022 Decision," respectively), ECF Nos. 24 and 25. *See* Rep. Perry's Emergency Mot. to Stay ("Perry Mot."), ECF No. 27; *see also* Rep. Perry's Mem. re Emergency Mot. to Stay ("Perry Mem."), ECF No. 27-1. The December 2022 Order permitted Rep. Perry to withhold from the government 161 records in whole and three records in part that he claimed were privileged under the Speech or Debate Clause ("Clause"), while rejecting Rep. Perry's claims of privilege with respect to 2,055 additional records that he does not dispute are responsive to a search warrant issued by this Court ("D.D.C. Warrant"). *See generally* Dec. 2022 Order. Upon review, Rep. Perry does not meet the high bar for the extraordinary relief that a stay confers. His motion is thus denied.[1]

---

[1] In the alternative, Rep. Perry requests the issuance of "a temporary stay" of the December 2022 Order "to allow the D.C. Circuit an opportunity to consider his appeal . . . by extend[ing] the date [ ] he is directed to provide documents to the Government . . . to Friday, January 6, 2023." Perry Reply at 9. His alternative request for a temporary stay of the December 2022 Order by an additional day is granted solely to allow Rep. Perry to file his emergency motion with the D.C. Circuit.

## I.      BACKGROUND

A detailed description of the factual and procedural history preceding this motion is set out in the December 2022 Decision, at 4–10, and is thus incorporated by reference here.

Specific to this motion, on December 28, 2022, the Court granted in part and denied in part Rep. Perry's motion for non-disclosure, holding that 2,055 of the 2,219 responsive records withheld by Rep. Perry are not privileged under the Clause, while 161 records were properly withheld in full and three records in part. *See* Dec. 2022 Order; Dec. 2022 Decision.   The December 2022 Order disclosed redacted versions of the three partially privileged records and required Rep. Perry to disclose the remaining 2,055 responsive records not covered by the Clause to the government by January 5, 2023.  Dec. 2022 Order at 1.

Rep. Perry then filed the instant motion for stay pending appeal on December 30, 2022, *see* Perry Mot, and an accompanying notice of appeal, *see* Rep. Perry's Notice of Appeal, ECF No. 26.  Notably, though this matter relates to an ongoing grand jury investigation, Rep. Perry's notice of appeal does not ask for expedited consideration by the D.C. Circuit, under D.C. Cir. R. 2 and 27(f).  Pursuant to an expedited briefing schedule entered by this Court, the government responded to Rep. Perry's motion on January 3, 2022, *see* Gov't's Opp'n to Mot. for Stay Pending Appeal ("Gov't's Opp'n"), ECF No. 29, and Rep. Perry filed a reply by January 4, 2022, *see* Rep. Perry's Reply re Emergency Mot. to Stay ("Perry Reply"), ECF No. 30. *See also* Scheduling Order (Dec. 31, 2022).  Briefing on this pending motion is complete and thus the motion is now ripe for resolution.

## II.     LEGAL STANDARD

"The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).  "'A stay is not a matter of

right, even if irreparable injury might otherwise result,'" *Nken v. Holder*, 556 U.S. 418, 433 (2009)

(quoting *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926)), and "[a] stay pending

appeal is always an extraordinary remedy," *Bhd. of Ry. & S.S. Clerks, Freight Handlers, Express

& Station Emps. v. Nat'l Mediation Bd.*, 374 F.2d 269, 275 (D.C. Cir. 1966); *see also Citizens for

Responsibility & Ethics in Washington v. Fed. Election Comm'n*, 904 F.3d 1014, 1017 (D.C. Cir.

2018) (per curiam) ("*CREW*") (describing a stay pending appeal as "extraordinary relief").

Courts considering a stay request pending an appeal must "'weigh competing interests,'"

*Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 732 (D.C. Cir. 2012) (quoting *Landis*, 299

U.S. at 254–55), by balancing the following factors as applied to the specific facts of the case: "(1)

whether the stay applicant has made a strong showing that he is likely to succeed on the merits;

(2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay

will substantially injure the other parties interested in the proceeding; and (4) where the public

interest lies," *Nken*, 556 U.S. at 434 (quotation marks omitted).   The first and second factors are

the "most critical" to determining whether a stay is warranted, *CREW*, 904 F.3d at 1017 (quoting

*Nken*, 556 U.S. at 434), while the third and fourth factors "merge" when the stay applicant so

moves against the government. *Nken*, 556 U.S. at 435.   The party seeking the stay bears the burden

of "mak[ing] out a clear case of hardship or inequity in being required to go forward, if there is

even a fair possibility that the stay for which he prays will work damage to some one else." *Landis*,

299 U.S. at 255.

## III.   DISCUSSION

Rep. Perry's motion is denied because all four of the stringent *Nken* factors weigh against

granting a stay.   First and foremost, Rep. Perry is unlikely to succeed on the merits for the reasons

fully explicated in the December 2022 Decision. [2]  The vast majority of the records at issue—

which records were recovered, pursuant to a search warrant issued by the U.S. District Court for

the Middle District of Pennsylvania, from Rep. Perry's personal cell phone and are indisputably

responsive to the D.D.C. Warrant—are not entitled to Clause protection because they do not

contain communications "that are 'integral' to [his] participation in 'the consideration and passage

or rejection of proposed legislation or with respect to other matters which the Constitution places

within the jurisdiction of either House.'"  Dec. 2022 Decision at 17 (quoting *Gravel v. United

States*, 408 U.S. 606, 625 (1972)).  Rep. Perry counters that these responsive records are protected

"[l]egislative information gathering" efforts under the Clause because they contain his

communication



---

[2]   The government argues that the first *Nken* factor of likelihood of success on the merits cannot be met because
the December 2022 Order was not a final decision on the merits, and, therefore, Rep. Perry is not entitled to bring an
appeal challenging the denial of his assertion of the Clause since no exception under the collateral order doctrine
permitting interlocutory review applies.  Gov't's Opp'n at 6–11.  Rep. Perry disagrees.  Rep. Perry Reply at 1–4
(arguing that the Dec. 2022 Order is appealable under the collateral order doctrine).  Regardless of whether the
December 2022 Order is appealable, none of the *Nken* factors militate in favor of a stay and, consequently, the merits
of the dispute over the appealability of the December 2022 Order need not be reached.

The December 2022 Decision, however, explained at length why Rep. Perry's "efforts as an individual Member either to obtain or relay information from or to others to be used to defeat or delay certification of the ECA vote and President-elect Joseph R. Biden's victory in the 2020 election," Dec. 2022 Decision at 27, were not protected under the Clause, and why his characterization of these efforts as "informal fact-finding" activities fell short of pulling the Clause's cloak of protection over those communications, under a straight-forward reading of binding Supreme Court and D.C. Circuit precedent, which require for proper invocation of the Clause that an "investigative step is fully and unambiguously authorized for a legislative purpose," *id.* at 21-22 (citing, *e.g., Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 506 (1975) and *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 416 (D.C. Cir. 1995)).

Consistent with this precedent, under *McSurely v. McClellan*, 553 F.2d 1277, 1286 (D.C. Cir. 1976) (en banc), to qualify for protection under the Clause, a Member's fact-finding efforts must be performed in a sufficiently procedurally regular manner, with formal congressional sanction or authorization, to constitute legitimate legislative activity. *See* Dec. 2022 Decision at 32–38; *see also id.* at 22 (explaining *McSurely*'s requirement that an informal investigation be congressionally authorized). To the extent that Rep. Perry believes that *McSurely* created no requirement that a Member's informal field investigations must be congressionally authorized, *see* Perry Mem. at 7–8, he is wrong for the reasons outlined in the December 2022 Decision.

None of the 2,055 responsive records that Rep. Perry has withheld as privileged contain communications relating to legislative-fact-finding efforts sanctioned or otherwise authorized in a

5

procedurally regular manner by any congressional entity. Rather, in large part, the communications illustrat ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In short,

Rep. Perry provides no reason why these communications reflect anything more than activities that are "casually or incidentally related to legislative affairs but not a part of the legislative process itself." *United States v. Brewster*, 408 U.S. 501, 528 (1972).

Rep. Perry also fails to grapple with the line-drawing problem of distinguishing between privileged and non-privileged communications that his theory of legislative privilege would create. In discussing the congressional authorization requirement, the December 2022 Decision explained how applying Rep. Perry's theory of Clause privilege to "informal fact-finding efforts untethered from a formal legislative inquiry" would be "'both unwise in principle and unworkable in practice[,]'" "assuredly 'create considerable confusion' as to whether the Clause applies[,] and invite inconsistent applications of the legislative privilege[,]" particularly considering, in the context of an *in camera* document review, "the full context of any given communication may not be discernible." Dec. 2022 Decision at 38–39 (quoting *In re Grand Jury Subpoenas*, 571 F.3d 1200, 1207 (D.C. Cir. 2009) (Kavanaugh, J., concurring)). Rep. Perry ignores this issue and the December 2022 Decision's analysis of this problem, which further undermines his contention that he will likely succeed on the merits on appeal.

Rep. Perry's focus on protection of his informal fact-finding efforts also elides the fact that a significant number of responsive records are communications that could not plausibly be related to fact-finding activities ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ These

communications largely reflect his efforts to relay information to other persons rather than trying to obtain, understand, or assess information

None of these communications appear to be remotely linked to fact-finding efforts, contrary to Rep. Perry's general description. Finally, the December 2022 Decision explained that the majority of communications that Rep. Perry received from Executive Branch officials "demonstrate that he welcomed, rather than resisted, and indeed often initiated these communications to relay information or urge consideration of a strategy by the White House or specific action to be taken by the White House, the Trump Campaign, or [the Department of Justice]." *Id.* at 49. "Given the Clause's purpose to protect congressional Members from untoward interference from the Executive Branch with legislative matters," the Court held that "Rep. Perry's reliance on the Clause to shield his multi-pronged push for Executive Branch officials to take more aggressive action is not only ironic but also must fail as beyond the scope of the Clause." *Id.* Rep. Perry does not even attempt to explain how the Clause likely applies to these records in his motion, so he cannot satisfy the first *Nken* factor.

Next up is irreparable injury, which militates strongly against granting a stay. Although Rep. Perry is technically right that once the 2,055 responsive records are disclosed to the government, they cannot be undisclosed to the government, *see* Perry Mem. at 10, his argument that his constitutional rights would be violated by disclosing the records misses the mark because he still maintains the core protections available under the Clause. Specifically, Rep. Perry would retain criminal immunity for his legislative acts, the right to object to the use as evidence of his

legislative acts, and the right to avoid being compelled to testify about his legislative acts. *Howard v. Off. of Chief Admin. Officer of U.S. House of Representatives*, 720 F.3d 939, 946 (D.C. Cir. 2013); *see also* Dec. 2022 Decision at 14–16. Nonetheless, Rep. Perry counters that the December 2022 Order and Decision "imperil[] [his] ability to object to the use of the material by the Government and his privilege against compelled testimony." Perry Reply at 5. This is inaccurate. The December 2022 Order was limited to the issue of non-disclosure, *see* Dec. 2022 Order at 1 (ordering Rep. Perry to disclose 2,055 responsive records in whole or in part to the government), leaving Rep. Perry free, at a minimum, to assert the Clause's privileges in the future if the government uses any of the 2,055 records against him in a criminal prosecution or tries to compel him to testify about his communications contained in these responsive records.

The potential injury that Rep. Perry may face by denial of a stay pending appeal, arising from disclosure to the government of the withheld responsive records, is accordingly far less damaging than the harm he would face if the protections outlined in the Supreme Court's Clause jurisprudence—protection from criminal and civil liability, testimonial privilege and nonevidentiary use privilege—were violated. *See In re Grand Jury Investigation*, 587 F.2d 589, 597 (3d Cir. 1978) ("But to the extent that the Speech or Debate Clause creates a Testimonial privilege as well as a Use immunity, it does so only for the purpose of protecting the legislator and those intimately associated with him in the legislative process from the harassment of hostile questioning. It is not designed to encourage confidences by maintaining secrecy, for the legislative process in a democracy has only a limited toleration for secrecy."); *United States v. Renzi*, 651 F.3d 1012, 1020 (9th Cir. 2011) (rejecting the contention "that there exists some grandiose, yet apparently shy, privilege of non-disclosure that the Supreme Court has not thought fit to recognize"). Given that Rep. Perry retains these critical protections under the Clause, his claim that he will be irreparably injured absent a stay is overblown.

Additionally, should the D.C. Circuit find, on appeal, that any or all of the 2,055 responsive records are in fact privileged under the Clause, the government points out that a partial remedy could be issued "by ordering the Government to destroy or return any and all copies [of the records] it may have in its possession." Gov't's Opp'n at 14 (quoting *Church of Scientology of California v. United States*, 506 U.S. 9, 12–13 (1992)). In any event, significantly undercutting Rep. Perry's claim of irreparable injury is his concession that the government has already obtained or certainly could access "most if not all, of the communications at issue here by other means." Perry Mem. at 11. Indeed, most of the 2,055 withheld responsive records that this Court has ordered disclosed are communications between Rep. Perry and other individuals, most of whom are not fellow congressional Members or staff. Assuming Rep. Perry is correct about the government already obtaining these same communications as part of the ongoing investigation from the individuals with whom Rep. Perry was communicating, requiring disclosure here will cause no harm to Rep. Perry at all since they are already in the government's possession. In short, Rep. Perry cannot demonstrate that an injury would be "certain and great," such that the second *Nken* factor weighs against granting a stay. *See Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).[3]

Finally, the interests of the government and the public weigh against a stay. Just as the grand jury is required to look "into all information that might possibly bear on its investigation until it has identified an offense or has satisfied itself that none has occurred[,]" *United States v.*

---

[3]     In reply, Rep. Perry says that he would face harm by disclosing the responsive records at issue because such disclosure "would provide the Government with information that it could use and make derivative use of in its consideration of filing criminal charges in a highly charged political environment." Perry Reply at 5. Rep. Perry's argument is flawed for two reasons. First, Rep. Perry retains civil and criminal immunity, a testimonial privilege, and a nonevidentiary use privilege for his legislative acts, so the government's use of any privileged records against Rep. Perry in a criminal prosecution would be prohibited under the Clause. Dec. 2022 Decision at 14–16. Second, the D.C. Circuit, in *United States v. Rayburn House Off. Bldg.*, 497 F.3d 654 (D.C. Cir. 2007) ("*Rayburn*"), never held that derivative use of a legislative record is privileged under the Clause but described the harm as limited to the "chill" that compelled disclosure of legislative records would cause. *See id.* at 661 ("This compelled disclosure clearly tends to disrupt the legislative process: exchanges between a Member of Congress and the Member's staff or among Members of Congress on legislative matters may legitimately involve frank or embarrassing statements; the possibility of compelled disclosure may therefore chill the exchange of views with respect to legislative activity."). Any derivative use of Rep. Perry's privileged records is, thus, not a harm that the Clause contemplates or recognizes.

*R. Enterprises, Inc.*, 498 U.S. 292, 297 (1991), and has a substantial interest in avoiding "delays and detours" that "would assuredly impede its investigation and frustrate the public's interest in the fair and expeditious administration of the criminal laws," *id.* at 298–99 (quotation marks omitted), the government also has a significant interest in moving forward expeditiously with the criminal investigation into those potentially involved in alleged criminal efforts to overturn the 2020 election.   Rep. Perry has diligently pursued his claims of legislative privilege, with the concomitant result that over four months after issuance of the D.D.C. Warrant, the government has yet to review a significant number of responsive records.   A prolonged appeal would only further delay disclosure of those responsive records.   The government and the public have a strong interest in reviewing expeditiously the records responsive to the search warrant since "in criminal cases[,] encouragement of delay is fatal to the vindication of the criminal law." *Khadr v. United States*, 529 F.3d 1112, 1117 (D.C. Cir. 2008) (cleaned up).[4]

None of Rep. Perry's alternative considerations outweigh the government and the public's interest in an expedient investigation.   For starters, pointing to the fact that the government has obtained 12,944 records from his cell phone and communications from others, like former Assistant Attorney General Jeffrey Clark and Trump Campaign attorney John Eastman, Perry Mem. at 11, is a misfire.   Even assuming he is correct about the government's access to others' records, this neither defeats nor deflects the government's interest in responsive records held on Rep. Perry's cell phone.   Instead, as already noted, to the extent that the 2,055 responsive records at issue overlap with communications already in the government's position, Rep. Perry only undermines his argument that he would be irreparably injured if a stay were not entered.   Next,

---

[4]      Rep. Perry's reliance on *Jewish War Veterans of U.S., Inc. v. Gates*, 522 F. Supp. 2d 73 (D.D.C. 2007), Perry Mem. at 12, is misplaced.   In that case, a partial stay in production of potentially privileged records under the Clause was granted because "the Court conclude[d] that the Members have raised a serious legal question on appeal," *id.* at 80, but no such persuasive argument is made here.   Moreover, since that case involved a civil dispute, the court had no necessity to consider the weighty public interest of impeding a significant criminal investigation. *Id.* at 82–83.

Rep. Perry contends that "[h]is constituents also have an interest in ensuring that he is able on their behalf to investigate facts that are central to his legislative activity without fear of reprisal." *Id.* at 12. Nothing about the December 2022 Order, however, prevents Rep. Perry from engaging in legislative fact-finding inquiries; it solely requires him to disclose records that are not privileged under the Clause. Also unavailing is his argument that he must be afforded time to solicit amicus participation, through the General Counsel of the House of Representatives, after Congress meets and "the new Speaker is elected." Perry Mem. at 12–13. During all the months this case has been pending, however, Rep. Perry has thus far failed to "request that the Court grant access to the sealed proceedings in this case so that the General Counsel of the House of Representatives may directly represent Congress' institutional prerogatives." *Id.*; *cf. Gomez v. United States Dist. Court for Northern Dist. of Cal.*, 503 U.S. 653, 654 (1992) (per curiam) (noting that the "last-minute nature of an application" or an applicant's "attempt at manipulation" of the judicial process may be grounds for denial of a stay). Any further delay in allowing the government's investigation to proceed only weighs against a stay.

Ultimately, Rep. Perry concedes that the December 2022 Decision was "thorough and detailed[,]" and he simply "disagrees with the Court's legal conclusions[.]" Perry Reply at 6. Having considered these disagreements again, this Court is not persuaded that his claims of legislative privilege were incorrectly evaluated in the December 2022 Decision, that he would be irreparably injured absent a stay pending appeal, and that the public interest favors granting the requested stay pending appeal.

Based on the foregoing analysis, Rep. Perry's motion to stay the December 2022 Order and Decision pending appeal is denied.

## IV.    ORDER

For the foregoing reasons, it is hereby

**ORDERED** that Rep. Perry's Emergency Motion to Stay, ECF No. 27, is **DENIED**; it is further

**ORDERED** that the December 2022 Order be **TEMPORARILY STAYED** until January 6, 2023, at 5:00 PM, to allow Rep. Perry the opportunity to file an Emergency Motion to Stay with the United States Court of Appeals for the District of Columbia Circuit; it is further

**ORDERED** that Rep. Perry comply with the December 2022 Order by no later than January 6, 2023, at 5:00 PM.

**SO ORDERED**.

Date:  January 4, 2023

BERYL A. HOWELL
Chief Judge

12